173 Cal.App.4th 1191 (2009)
___ Cal.Rptr.3d ___
JOSEF MAATUK et al., Plaintiffs and Appellants,
v.
BRUCE J. GUTTMAN et al., Defendants and Respondents.
No. B200675.
Court of Appeals of California, Second District, Division Five.
March 27, 2009.
*1192 Kosnett & Durchfort and David E. Durchfort for Plaintiffs and Appellants.
Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Bartley L. Becker and Allison Ann Arabian for Defendants and Respondents.

OPINION
ARMSTRONG, J. 
Josef Maatuk appeals from the judgment entered in favor of respondent Bruce J. Guttman, on Maatuk's complaint. We affirm.

Facts
Respondent represented Maatuk, a mechanical engineer, in litigation which resulted in the invalidation of two patents which Maatuk had obtained for a *1193 liquid-level sensor. This legal malpractice case followed. In this case, the jury was instructed that respondent was negligent in his representation of Maatuk. On special verdicts, the jury found negligence and that respondent had breached his fiduciary duty.[1] The jury also found that the breach of duty was a substantial factor in causing harm or monetary damage to Maatuk, and made the same finding about respondent's negligence.[2] On damages, the jury was asked "What are Dr. Josef Maatuk's monetary damages? a. Past and Future Lost Earnings?" The jury answered "$0.00."
The question on appeal concerns damages, more specifically, the trial court's order striking the testimony of Maatuk's damages expert, Dr. Barbara Luna. Our summary of the facts is directed toward that issue:
Maatuk expected to profit from his invention through a licensing agreement through which he would earn a royalty on each sale.
He presented evidence that his sensor worked, or could be made to work, could be built from readily available components at the commercially attractive price of $2, was attractive to industry because it had no moving parts and was multifunctional, and that it had many commercial applications. He presented evidence that, for instance, in a car, his sensor could measure fuel level, density, and vapor leakage; engine oil density and level; coolant level and quality; windshield wiper fluid level; and transmission fluid viscosity and level. Thus, five of his sensors could be used in a car. Car manufacturers would pay $7 for each. A pleasure boat could use the sensors for fuel level, water level, and septic tank height, at $40 per sensor.[3]
This evidence was in large part through his own testimony. For instance, the only evidence that the sensor could be manufactured for $2 was his *1194 testimony, as was the only evidence on the number of sensors which could be placed in a car or boat, etc., and the price which could be charged, though Maatuk's enablement[4] expert, Alberto Schroth, testified that the sensor could be built from readily available components and had commercial application for use in transmissions, batteries, compressors, commercial washing machines, etc., and that the sensor was attractive because it had no moving parts.
Much of Maatuk's evidence concerned commercial interest in his technology. The patents, which he obtained in 1998 and 1999, were invalidated in 2002. He presented evidence that in 1996, he entered into an agreement with Kysor Medallion, under which Kysor Medallion would test the technology and fund development of the probe, a critical part of the sensor. In 1997, he entered into an agreement with Therm-O-Disc, the other party to the patent litigation. Therm-O-Disc would test the sensor and if the tests were successful, license and manufacture the device. When the patent litigation was filed, in 2000, he was discussing funding for "productization," validation, and testing of the technology with the Robert Bosch Corporation. There was also interest from Vickers Tedesco, Navistar, Visteon, and Walbro. Maatuk's evidence was that Kysor Medallion's and Therm-O-Disc's tests showed that the device worked within the specifications set out for the development phase, and that any problems were easily fixable.
On damages, Maatuk testified that the patents were worth $12 million, based on the fact that Bosch was interested in funding "commercialization" of the device, and that Bosch had a 20 percent market share and would pay a 3 percent royalty. The jury was instructed that he was testifying as a lay witness, not as an expert. Maatuk also testified that after the first two patents were invalidated, the value of his remaining technology was reduced. Everyone could go back to his earlier technology, modify it, and get a patent.
Dr. Luna, Maatuk's expert witness on damages, was a CPA (certified public accountant) and business appraiser with experience in valuing patents. She calculated lost royalties between 2003, the year after the patents were invalidated, and 2014, reasoning that each patent had a 20-year life dating from the 1995 patent application. Based on assumptions on the royalty rate, number of units (that is, cars or boats, etc.) manufactured each year, the number of sensors which would be placed in each unit, the price which would be charged for each sensor, and the market penetration Maatuk's sensor *1195 would achieve, she concluded that Maatuk's lost royalties had a present value of between $17.6 million and $205.3 million.
Luna's assumption on the number of units manufactured was based on published statistical information. The royalty rate, 3 percent, was based on a published database and on the documents in this case. The assumptions about the number of sensors which could be placed in each unit, cost to manufacture, and the price which could be charged, she learned from Maatuk, a consultant, Fred Beegle, who worked with Maatuk in the Bosch discussions, and in some instances from other depositions in this case. The assumption about market penetration was based on conversations with Maatuk and Beegle, and was that Maatuk's sensor would have 5 percent of each market in 2003, building to 50 percent in certain markets and to 25 percent in other markets.
Respondent's evidence was that Maatuk did not suffer any damages from the loss of his patents, because he never had a product to sell. He had an idea, but no product.
Respondent's experts testified that the Kysor Medallion and Therm-O-Disc test results showed that the sensor did not work, and respondent emphasized the fact no one had actually licensed the technology. Instead, each manufacturer who expressed interest quickly lost interest. For instance, Kysor Medallion, which had agreed to pay $70,000 to "productize" the probe to a specified degree of accuracy and to pay additional sums for future phases of development, made an initial payment of $35,000, and a second payment of $18,000, and refused to pay any more. The matter went to arbitration, which did not result in an order that Kysor Medallion make an additional payment.[5] Therm-O-Disc, too, refused to license the technology, but instead took out its own patent, disclosing one of Maatuk's patents as prior art.
Maatuk had entered into evidence the report of a Bosch engineer, emphasizing the portion which said that the sensor "has the potential to sense the level of other fluids such as engine oil, transmission fluid, windshield washer fluid ...." The defense emphasized the conclusion that "... though the basic function was demonstrated, it is unclear whether a commercially viable product would meet the requirements of an automotive fuel delivery system, etc...."
Another defense expert, Dr. Gary Cochran, a physicist with experience in the automotive industry in design, and in manufacturing costs, testified that *1196 the Kysor Medallion test results showed problems which were consistent with the problems he saw in the device as described in the patents.
Respondent also called, for instance, Alexander Strozer, an engineer at Magneti Marelli, which manufactures parts for the boat, automotive, and motorcycle industries. In 2004 or 2005, Strozer looked at data Maatuk supplied and tested prototypes of Maatuk's probe. He found accuracy problems, and no visible progress since the Kysor Medallion tests. Strozer believed that Maatuk had had enough time to work on the problems, and that given that he had not solved them, he would not be able to solve them in a year, which was what Magneti needed. The technology was "too far from a product," and was more of a concept. Strozer also testified that Maatuk did not have the kind of professional approach to testing which would allow Magneti Marelli to partner with him in developing the sensor. A former employee of Vickers Tedesco testified that Vickers Tedesco had at one point found Maatuk's technology interesting, but did not move forward because Maatuk had no working product.
On cross-examination of Fred Beegle, respondent elicited the testimony that Maatuk had claimed that the sensor had 1 percent accuracy, but that there was no evidence to support the claim, and that as far as Beegle knew, no one had ever made Maatuk's technology work.
Cochran also testified, as an expert, on the cost to mass-produce the device described in Maatuk's patents, which he put at $18 a device. The technology then in use cost between $2.50 and $3 a device. Boat manufacturers paid no more than $8 for a liquid-level sensor. Coolant levels were currently measured by a microswitch on a float, which cost about 50 cents to manufacture. Oil was measured with a dipstick, which cost about the same. There was only one liquid-level sensor in a car. No car manufacturer in the world used five liquid-level sensors. The same was true of trucks. He himself had patented, and licensed, a liquid-level sensor. The price point it had to meet was $3. Cochran opined that even if Maatuk's technology could be made to work, it would have no value to the marine or automotive industries because it was cost prohibitive.
After the close of evidence, respondent moved for nonsuit. The court denied that motion, but after additional argument, and a motion by respondent, the court struck Luna's testimony, finding that there was no basis for her assumption concerning market penetration or her other assumptions, noting in particular the disparity between the undisputed evidence that Maatuk had earned essentially nothing from his technology before the patents were invalidated, and Luna's assumption of 5 percent market share in many markets, the year after the patents were invalidated. The court found that *1197 evidence was that "you are not going to have any share of the market. He has got no product" and "no working application of any kind." The court described Luna's testimony as "an entirely theoretical construct completely abstracted from any reality."

Discussion
(1) Under the Evidence Code, an expert opinion may be based on any matter made known to the witness "at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion ...." (Evid. Code, § 801, subd. (b).) "The court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion." (Evid. Code, § 803.) A trial court enjoys broad discretion in ruling on foundational matters on which expert testimony is to be based. (Id., §§ 801, subd. (b), 802; Board of Trustees v. Porini (1968) 263 Cal.App.2d 784, 792-794 [70 Cal.Rptr. 73].) Our review is for abuse of discretion. (Lockheed Litigation Cases (2004) 115 Cal.App.4th 558, 564 [10 Cal.Rptr.3d 34].) We see no abuse of discretion in the court's ruling here.
We begin by noting that there was no challenge to Luna's expertise in patents and valuations. That expertise meant that she was qualified to choose a method for valuing damages and to make her calculations. That was, however, the limit of her expertise. She was not an expert in the automotive or other relevant industries, or in sensors or the technology, but relied on others for almost all the assumptions underlying her calculations. As she herself testified on cross-examination, if the underlying assumptions were not true, her opinions were "just so much math."
There was sufficient foundation for some of those assumptions. Her assumptions about the number of units manufactured each year and on the royalty rate were based on published sources of the kind experts rely on.
(2) We would even say that there was sufficient foundation for her assumptions about the number of sensors which could be placed in a car or boat, etc., the cost to manufacture, and the price which could be charged. Maatuk testified that he had researched cost and price and markets and Beegle testified that he was a consultant to the automotive industry and that he had prepared market projections for Maatuk's sensor. Luna seems to have relied on Maatuk and on Beegle for her assumptions on these points, though she did not specify that she reviewed Beegle's market projections or Maatuk's underlying research. Nor was there any indication that she was qualified to evaluate either the projections or the research. Further, because neither Maatuk nor Beegle testified as an expert in those areas, neither could *1198 testify to hearsay, leaving the jury and the court in the dark about much of the foundation for Luna's assumptions. However, an expert may rely on any information of the type reasonably relied on by an expert, even if it is hearsay, and from a nonexpert. (Continental Airlines, Inc. v. McDonnell Douglas Corp. (1989) 216 Cal.App.3d 388, 415 [264 Cal.Rptr. 779]; People ex rel. Dept. of Transportation v. Clauser/Wells Partnership (2002) 95 Cal.App.4th 1066, 1085 [116 Cal.Rptr.2d 240].)
(3) Where Luna's testimony fails is with her assumptions on market penetration and her underlying assumption that Maatuk had a product to sell.
Concerning market penetration, Luna did not testify to any expertise on the market. She did not testify, for instance, that she knew how long it took a car or boat manufacturer to decide to purchase a new device, or whether a device such as Maatuk's would require any design changes in, for instance, a fuel tank, or the lead time it would take to make such changes, or whether there were competing devices on the market which might satisfy a manufacturer's desire to put five liquid-level sensors in a car. To the contrary, she testified that those matters were outside her expertise. For instance, Luna assumed that the sensor would be used in helicopters in 2003, but when asked whether the FAA (Federal Aviation Administration) or other agency had to approve helicopter parts, and the time any approval process took, Luna did not know.
For her numbers on market penetration, she relied only on Maatuk and Beegle. She did not establish that either had any relevant expertise, or how either had calculated a 5 percent market penetration, or whether either had considered the factors just listed, or that this was the kind of evidence that an expert might rely on. We thus can see no foundation for her assumption that Maatuk would capture 5 percent of each market in 2003, building to a much greater number.
What is more, the basic assumption underlying all of Luna's testimony was that Maatuk had a product to sell. She relied on Maatuk for this assumption, having no expertise which would allow her to evaluate the test results, the reasons his attempts to license the technology had failed, or the sensor and underlying technology. She made no pretense about this. For instance, when asked whether the sensor would work in water and fuel and transmission fluid and would perform all the other functions which Maatuk had testified to, Luna answered that she believed so, but that the answer was beyond her expertise.
A working device is the critical assumption. A manufacturer's desire to put five liquid level sensors in a car is irrelevant to Maatuk's damages, if he had nothing to sell. That was the state of the evidence. There was no evidence *1199 that at the time the patents were invalidated, Maatuk had a product to sell. Even Maatuk's own evidence was that he was still seeking to develop a product. This renders Luna's calculations irrelevant.
For this reason, we would affirm even if we found that the court had erred in excluding Luna's testimony. It is well established that even where evidence is improperly excluded, the error is not reversible unless it is reasonably probable that a result more favorable to the appellant would have been reached without the error. (Tudor Ranches, Inc. v. State Comp. Ins. Fund (1998) 65 Cal.App.4th 1422, 1431-1432 [77 Cal.Rptr.2d 574].) We see no such probability.
The evidence was that Maatuk had been attempting to profit from the technology from at least 1996, but by the time of the Therm-O-Disc litigation, which began in 2000, he had earned essentially nothing. That was the evidence with, and without, Luna's testimony.
Maatuk argues that the payments from Kysor Medallion indicate that the patents could have been profitable. To the contrary, the evidence that Kysor Medallion, after testing the probe, cancelled its arrangement with Maatuk, showed the lack of potential.
Moreover, although Maatuk testified that the invalidation of the patents meant that anyone could make money from his ideas, there was no evidence that anyone ever had, and indeed, there was evidence to the contrary. This would have been devastating to Maatuk's damages case. We say the same about the uncontroverted evidence that even at time of trial, no car or truck manufacturer used more than one liquid-level sensor, not the five which Maatuk testified would be used.
Further, the exclusion of Luna's testimony did not leave the jury without evidence, from plaintiff, on damages. Instead, the jury had evidence through Maatuk's testimony that the technology had enormous commercial potential. The jury also had Maatuk's testimony the patents were worth about $12 million. The jury had ample basis on which to award damages, and its choice to award none can only mean that it found that the defense theory was correct. Maatuk had patents (which, as the court said to counsel, intrinsically had some value) but he did not have anything that anyone wanted to buy.
Maatuk also argues that the court erred by refusing to instruct the jury with CACI No. 3903N, on lost profits, that "To recover lost profits [plaintiff] must prove it is reasonably certain that [he] would have earned profits but for [defendant's] conduct. To decide the amount of damages for lost profits, you must determine the gross amount [plaintiff] would have received ...."
*1200 We agree with respondent that Maatuk cannot raise this argument. In the trial court, he agreed that the court could omit the instruction. Moreover, the court defined lost earnings in a way which could have allowed the jury to award the $12 million which Maatuk said the patents were worth. That is, the court defined "lost earnings" by instructing the jury that "To recover damages for past lost earnings Doctor Maatuk must prove the amount of income that he has lost to date. To recover damages for future lost earnings Doctor Maatuk must prove the amount of income he will be reasonably certain to lose in the future as the result of the injury."

Disposition
The judgment is affirmed. Respondent to recover costs on appeal.
Turner, P. J., and Kriegler, J., concurred.
NOTES
[1] The malpractice at issue was the failure to respond to dispositive motions.
[2] The complaint also included causes of action for fraud and misrepresentation (that respondent had falsely represented that he had malpractice insurance and that he had experience in patent or intellectual property law), and the jury found that respondent knowingly made a false representation with the intent that Maatuk rely on the representation and that he did reasonably rely, but that the reliance was not a substantial factor in causing harm or damage.
[3] Maatuk testified that five sensors could be placed in an off-highway vehicle and that he could charge $100 for each of the sensors; GE (General Electric) was looking for oil level, fuel level, and battery level sensors for diesel locomotives and would pay $250 per sensor; helicopter manufacturers were looking for fuel sensors and oil sensors which could sense not just oil level but oil quality, at $150 for each sensor; and so on for commercial washing machines (one $50 sensor); small compressors (one $60 sensor); large compressors (one $120 sensor); semiconductor manufacturers (one $300 sensor); and food processing machines (one $75 sensor.) In his brief, Maatuk suggests that he was not allowed to testify on this subject, or on manufacturing costs. He was not allowed to testify to hearsay, as an expert, but he was allowed to testify.
[4] A patent must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same ...." (35 U.S.C. § 112.) That is enablement, and one of respondent's defenses was that Maatuk's patents would have been invalidated even in the absence of malpractice, because they were not enabled. Both sides called witnesses on the question, with qualified experts testifying that the patents were, or were not, enabled.
[5] Maatuk testified that he considered the result a win, because he was not required to pay Kysor Medallion's legal fees, despite a fees clause in the agreement.