Filed 5/31/16  P. v. Howell CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TREVOR RICHARD HOWELL,<br><br>    Defendant and Appellant. | H040885<br>(Santa Clara County<br>Super. Ct. No. C1241247) |

After a day of work as a landscaper, Felipe Avalos had just changed into his sandals and had opened the trunk of his car to put away his work boots when he was severely beaten by an unknown assailant armed with a large metal object.  Based on eyewitness descriptions, police apprehended defendant Trevor Richard Howell on a nearby trail.  A jury convicted defendant of attempted murder (Pen. Code, §§ 187, 664, subd. (a)),[1] and it found true the allegations that he had personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)) and had personally inflicted great bodily injury (§§ 1203, 12022.7, subd. (a)).  Defendant admitted that he had suffered one prior strike conviction (§§ 667, subds. (b) – (i), 1170.12 ), one prior serious felony conviction (§§ 667, subd. (a)), and one prior conviction for which he had served a prison term (§ 667.5, subd. (b)).  The court sentenced defendant to 24 years in prison.

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant contends the trial court erred by precluding him from cross-examining the prosecution's DNA expert about a Santa Clara County criminal case that was ultimately dismissed at the request of the district attorney (the *Anderson* case). He also contends he was not allowed to question his own DNA expert on direct examination about that case. Because one theory in the *Anderson* case (as reported in the news media) was that DNA evidence relied upon to charge Anderson had been accidentally contaminated by a paramedic who had treated both Anderson and the victim on the day of the crime, defendant argues it was prejudicial error for the court to exclude references to the *Anderson* case in his examination of the DNA experts. He also argues the court erred in prohibiting his counsel from referring to the *Anderson* case during closing argument.

We conclude the trial court did not abuse its discretion by prohibiting defendant from examining the DNA experts about the *Anderson* case or by precluding his counsel from referring to the case in closing argument. We will therefore affirm the judgment.

FACTUAL BACKGROUND

I. *Prosecution Evidence*

A. The Assault

On August 17, 2012, at approximately 3:00 p.m., Felipe Avalos and his foreman, Heriberto Garcia, had finished some landscaping work in Cupertino and had returned to their employer, Martina Landscaping, at 811 Camden Avenue in Campbell. After parking the company truck in the yard, Garcia went inside the office. Avalos went to his car, where he took off his work boots and put on sandals. As he opened the trunk of his car, he noticed over his right shoulder a person about 100 feet away walking toward him. The man was wearing a gray sweatshirt and black pants. Avalos did not pay attention to the man because a number of people walk in that area. As he was placing the boots in his trunk, Avalos heard the sound of someone running toward him. As he turned, he saw the same man with something shiny in his right hand that appeared to be a metal object of

2

two and one-half to three feet in length.  The man struck Avalos on the right side of the head with the object.

As the man continued to strike Avalos on the head, Avalos tried unsuccessfully to fend him off by pushing and hugging him.  Avalos asked the man, " 'Why are you hitting me?' "  The man did not respond.  Avalos then slipped and fell as he tried to run away.  Before falling, he estimated he was struck 10 to 15 times.  While Avalos was on the ground, his assailant continued to strike him even more forcefully.  Avalos tried to cover his head with his hands, which absorbed many of the blows.  Avalos was struck on the ground more times than when he had been standing.  At some point, the assailant grabbed Avalos by the shirt with his left hand.  Avalos called out for help and then saw a car stop next to him.  He heard a woman tell the assailant to leave Avalos alone.  The assailant then ran off.

The woman who came to Avalos's assistance, Richelle Valone, was driving south on Camden Avenue on her way home at approximately 3:20 p.m.  As she drove around the corner, she saw a man striking another man on the head three or four times with what appeared to be a hammer.  The victim's face was covered with blood.  Valone stopped the car approximately eight to nine feet in front of them, threw up her arms, and said, " 'What are you doing?' "  When she stopped the car, she could see both men out of the front windshield.  The assailant took off running, passing by the front of Valone's car.  The assailant then crossed the street to the parking lot of another business.  Valone called 911.

Avalos bled profusely.  Blood covered his face and was on his clothing.  He said his head "felt like [] it was going to explode because of all the swelling."  An ambulance arrived shortly after the attack and transported him to the Santa Clara Valley Medical Center (VMC) emergency room.  The medical staff checked for skull fractures and closed several head wounds with staples.  Avalos was discharged from the hospital after about three or four hours.  In addition to injuries to his face and head, Avalos sustained a

3

scratch on his left shoulder that he believed had occurred when his assailant grabbed his shirt with his left hand. Avalos testified that his head hurt worse the day after the attack. Avalos returned to work one month later, but was still in pain. At the time of trial—one year after the attack—Avalos continued to suffer headaches, including migraines.

### B. Apprehension of Defendant

On the afternoon of August 17, 2012, Officer Terry Gallagher of the Campbell Police Department was dispatched to a reported assault with a suspect who was fleeing the scene. She left the station immediately on her motorcycle and went to a location that was at the perimeter of where the suspect was believed to have fled. She went to the Los Gatos Creek trail that runs from north to south from Hamilton Avenue in San José to Knowles Drive at the border of Los Gatos. The trail is used as a recreation area for running, cycling, and walking. As she was riding south on the west side of the trail, she passed a man walking north. The man's clothing matched the suspect's description.

After passing the man, Officer Gallagher stopped and turned her motorcycle around to watch him. She obtained an updated description of the suspect from dispatch that indicated he was "a white male with a gray or white hooded sweatshirt[,] dark pants, dark shoes[,] about 5 [feet] 8 [inches], medium build," possibly having a goatee. Based upon this updated description, Officer Gallagher drove her motorcycle back toward defendant and detained him. He was wearing dark pants of a jean-type material and a dark tank top. Although it was not the kind of attire she would associate with running, Officer Gallagher observed that defendant was sweating and seemed to be out of breath. The location where Officer Gallagher detained defendant was between one-quarter and one-half mile from 811 Camden Avenue. Based upon her 18 years of experience in patrolling the Campbell area, Officer Gallagher opined that a person could have travelled on foot from 811 Camden to the area where defendant was stopped within the time that had elapsed between the initial dispatch and when she encountered defendant.

4

After stopping defendant, Officer Gallagher noticed that he had some scrapes on both the insides and the knuckles of his hands. She searched him, whereupon she found tissue in defendant's front pocket that appeared to have blood on it.

C.     Identification

Valone, the woman who interrupted the attack, described the assailant as wearing a dark pullover sweatshirt with a hood and dark black pants. When she encountered the assailant during the attack, she observed only part of his face (from the bridge of the nose down). When the assailant ran by her, she got a direct view of his face from a distance of approximately three and one-half feet from the front of her car. The man was Caucasian, in his 40's, had a somewhat slender build, was approximately five feet eight inches to five feet nine inches in height, and had a goatee.

An officer responding to the scene transported Valone to a location five to ten minutes away to see if she could identify the person who had been stopped by Officer Gallagher on the trail. The officer stopped his patrol car 30 to 50 feet from the suspect. Valone did not get out of the patrol car. Instead, she viewed the suspect through the window of the patrol car and through a cyclone fence that was between them. Valone testified that when she viewed the person at that time, although he was not wearing a sweatshirt, she "felt that it was [the assailant]." She told the officer that, on a scale of one to ten (with ten being the most certain), her degree of certainty was seven or eight. Valone also identified defendant in court as the assailant, again indicating that her level of certainty was a 7 or 8 out of 10.

During cross-examination, Valone admitted that she had told the 911 operator the assailant was in his 30's, she could not recall his ethnicity, and she did not know whether he had facial hair. Valone also admitted that she did not immediately recognize defendant as the assailant at the preliminary hearing. At that hearing, she could not estimate the assailant's age, and she thought defendant's facial hair was thinner than the assailant's.

5

Avalos testified that his assailant wore a gray sweatshirt with a hood that covered his head and forehead. He could only see the man's face from about the bridge of the nose to his chin. Avalos described him as a white male who had a sunburn, a thin nose, and a brown goatee. He was between 30 and 40 years old, between five-feet-eight inches to six feet tall, and had a thin build. On the evening of the attack, after receiving treatment at the hospital, Avalos went to the Campbell Police station where he was unable to identify defendant as his assailant. He told the police that defendant had the same build and the same pants as his assailant, but defendant was not wearing the sweatshirt the assailant had worn so it was difficult to identify defendant as the person who had attacked him.

On cross-examination, Avalos agreed that he had told the police that defendant's pants looked like a different fit than the ones worn by his assailant. Avalos also told the officers that he thought his attacker was shorter than defendant and had a thinner mustache. When asked in court whether defendant looked similar to his assailant, Avalos responded: "The height, the type of body, slim. And the face. Slim face. What I was able to see from this part of the chin but it is very difficult for me to tell you a straight answer, if it is or if it is not that person."

### D. Forensic Evidence

#### 1. *Police Agent Martin Rivera*

Police Agent Martin Rivera has been a law enforcement officer with the Campbell Police Department for 17 years. He has received over 200 hours of training in the field of evidence collection and has worked at over 100 crime scenes for the purpose of collecting evidence. "Virtually all" of the evidence collection classes Agent Rivera attended included instruction in the collection of DNA evidence. He has personally collected DNA evidence at between 50 to 100 crime scenes.

On the afternoon of August 17, 2012, Rivera was called by a sergeant to the scene of the assault at 811 Camden Avenue. While there, Rivera took several photographs and

collected some blood samples from the driveway. In collecting the blood samples, he wore gloves, and he used sterile Q-tips that had been submerged in sterile water. He placed the samples into a paper bag. He then returned to the police station and placed the samples into a locker for drying.

After completing this task, Rivera went to VMC to meet with Avalos. Before meeting with him, Rivera washed his hands and put on a new pair of gloves. Rivera photographed Avalos and, after observing scratch marks on his left shoulder and back, Rivera photographed them and took swab samples of the scratch marks. He did so because there is the possibility of DNA being transferred when one person is scratched by another. It is also possible that DNA from the victim may have been transferred under the suspect's fingernails. He also took a buccal swab from the inside of Avalos's mouth to be used later by the Santa Clara County Crime Laboratory (Crime Lab) to create Avalos's DNA profile. In taking the samples, Rivera washed his hands, put on a new pair of latex gloves, and used sterile Q-tips that are packaged separately in sterile packaging. Rivera took the DNA samples and articles of Avalos's clothing to a separate location—the police evidence drying room at the Campbell Community Center.

Rivera next went back to the police station to meet with defendant in a holding cell. Before meeting with defendant, Rivera washed his hands and put on a new pair of gloves. He explained to defendant that the police would be taking some samples and collecting some evidence from him. Before taking samples, Rivera photographed defendant, including his hands to document scrape marks on them. Rivera swabbed each of defendant's fingernails and the scrapes on his hands. He also took scrapings from underneath defendant's fingernails and took a buccal swab from the inside of defendant's mouth. Each of the samples was placed in a separate envelope, and each envelope was then placed in a separate, second envelope. The envelopes were all placed into a locked evidence locker to dry at the police station, which was a different location from where Avalos's DNA samples were stored.

The next day, Rivera returned to the police station. After washing his hands and putting on new pair of gloves, he folded the envelopes containing defendant's samples and sealed them closed with tape. Rivera then went to the police drying building at the Campbell Community Center. There, he washed his hands, put on new pair of gloves, and sealed the envelopes containing Avalos's samples.

### 2. *Criminalist Alan Dixon*

Alan Dixon is a criminalist with the Crime Lab. He has been a criminalist since 2005. Before commencing work with the Crime Lab in March 2012, Dixon was a criminalist for one year with the Oakland Police Department, a forensic scientist for three years with Applied Biosystems (a firm that develops forensic DNA typing technologies used in crime laboratories worldwide), and a criminalist for two and one-half years at the Georgia Bureau of Investigation's Division of Forensic Sciences. He performed DNA analyses from various samples received from the Campbell Police Department related to this case. The samples included buccal swabs from Avalos and defendant, right-hand nail swabs and scrapings from defendant, left-hand nail swabs and scrapings from defendant, and a swab from Avalos's back. Dixon generated a report of his forensic analysis that was reviewed by two other Crime Lab scientists.

From Dixon's analysis of defendant's right-hand nail swab, he concluded that defendant was the major male source of the DNA profile, with a secondary DNA contributor at levels too low to perform "any type of meaningful inclusions or exclusions of those particular samples." Dixon found that Avalos was the sole source of DNA from the swab taken from Avalos's back. From his analysis of defendant's left-hand fingernail swab, Dixon determined that the sample contained a mixture of DNA from at least three individuals, at least two being male. After including defendant as a potential DNA contributor given the source of the swab, Dixon deduced that Avalos was the second male contributor to the sample. The mixture ratio of the DNA from defendant and Avalos in the sample was nearly equal. Dixon opined that "[t]he probability of finding

8

this collection of alleles [for which he associated Avalos as the contributor] . . . at random in the population" was 1 in 74 quadrillion for the Caucasian population, 1 in 12 quadrillion for the Hispanic population, and 1 in 2.2 quintillion for the African-American population.

II.     *Defense Evidence*

A.      Defense Expert Marc Taylor

Marc Taylor is a forensic scientist who testified as an expert on behalf of defendant. He owns and operates Technical Associates, Inc. (TAI), a laboratory in Ventura. The majority of TAI's work involves DNA analysis, mostly for defense attorneys. TAI's work includes (1) reviewing and evaluating testing that has been done by other laboratories, usually in connection with a specific criminal case, (2) determining whether the conclusions drawn from the testing are appropriate, and (3) identifying any potential problems with the testing. TAI's work often includes the retesting of DNA samples.

Taylor and TAI did not perform any DNA analysis or testing in this case. From the materials he reviewed, Taylor agreed with Dixon's analysis and test results. Taylor testified there were ways in which the DNA samples in this case could have been contaminated during the laboratory process. He said contamination could have occurred in the amplification process, depending upon whether the samples were kept and handled separately during the process. But he also testified that during the extraction process, if personnel at the Crime Lab had handled samples separately at different times, as was indicated in the logs, there should have been no contamination.

Taylor also testified there were various ways in which the DNA samples may become contaminated in the field, and he was aware of specific instances of DNA contamination as a result of objects being taken from place to place or by having the same person collect different samples at several locations. He said the blood samples taken from the scene, the sample from scratches on Avalos's back, and the buccal swabs

9

taken from Avalos at the hospital were each potential sources for the contamination of the samples taken from defendant's fingernails. Taylor postulated that Police Agent Rivera, by handling the same camera at all three locations (i.e., the scene of the crime, the hospital, and the holding cell), could have transferred DNA to contaminate the samples taken from defendant. Specifically, Taylor noted that Rivera used his camera in the hospital with the same gloved hands he used to take samples from Avalos, thereby creating the possibility of contamination of subsequent samples that were taken. He also suggested that a sample could have been contaminated if Rivera had used his cell phone at one of the locations, transferred DNA onto it, and later transferred the DNA while taking a sample at a different location. And he testified that the fact that Rivera went to each of the three locations, of itself, furnished the possibility of contamination of the samples taken from defendant at the holding cell. On cross-examination, Taylor reiterated that there was a possibility of DNA having been contaminated in the field, but he indicated he had no way of assessing the likelihood or probability of such contamination.

### B. Dr. Robert Shomer

Dr. Robert Shomer is an experimental psychologist who has testified as an expert on the subject of eyewitness identification. Dr. Shomer opined that the identification of strangers "has the lowest reliability of eyewitness identification." He testified that the more specific the initial description of the stranger by the eyewitness, the more likely he or she would be able to differentiate the stranger from other similar-looking people. Stated otherwise, the less detail about the stranger the eyewitness has initially, the greater the "possibility of mistaking [the stranger] for somebody that looks similar." Other factors that reduce reliability include where (1) there is cross-racial identification; (2) the witness's attention is divided; (3) the stranger is moving; (4) the event is sudden; and (5) the circumstances of the event are stressful. Dr. Shomer also testified that in-field show-up identifications are "considered to be inherently suggestive" and have "a high

rate of error." He also opined that the "top of the head is critical more so than other areas of the face," so that the ability of a witness to identify a stranger in a show-up would be impaired where the witness initially observed the stranger wearing a hooded sweatshirt that obscured part of the face.

### III.    *Stipulated Evidence*

A stipulation was read to the jury that, based upon video surveillance footage retrieved by Campbell Police Officer Ramirez defendant entered a Safeway store at 2341 Winchester Boulevard in Campbell in August 17, 2012, at approximately 2:49 p.m., and he exited the store at approximately 2:55 p.m. Defendant appeared to be carrying a white shirt or bag. Counsel further stipulated that a piece of rebar was found at 811 Camden Avenue on August 18, 2012. The rebar was booked into evidence. "Laboratory testing of the rebar yielded no DNA or other relevant results."

## PROCEDURAL BACKGROUND

Defendant was charged by information filed October 25, 2012, with attempted murder (§ 664, subd. (a), § 187; count 1), and assault with a deadly weapon (§ 245, subd. (a)(1); count 2). It was further alleged as to count 1 that defendant acted willfully, deliberately, and with premeditation (§§ 664, 187, 189), and that he personally used a deadly weapon (§ 12022, subd. (b)(1)). As to both counts, it was alleged that defendant personally used a deadly weapon (§§ 667, 1192.7) and personally inflicted great bodily injury (§§ 12022.7, subd. (a), 667, 1192.7). It was also alleged that defendant had suffered a prior strike conviction (§§ 667, subd. (b)/1170.12), a prior serious felony conviction (§ 667, subd. (a)), and a prior felony conviction for which he had served a prison term (§ 667.5, subd. (b)).

After a trial by jury, defendant was convicted on August 20, 2013, of attempted murder. The jury found true the allegations that defendant personally used a dangerous or deadly weapon and that he personally inflicted great bodily injury. The jury found not true the allegation that defendant acted willfully, deliberately, and with premeditation.

11

Defendant waived his right to a trial of the strike prior, serious felony prior, and prison prior allegations, and he admitted those allegations.

After denying defendant's motion for the court to exercise its discretion to dismiss the prior strike allegation under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, the court sentenced defendant to a term of 24 years. The sentence was based upon the midterm of seven years for attempted murder, doubled due to defendant's prior strike, plus one year for the weapon-use enhancement, three years for the great bodily injury infliction enhancement, five years for the prior strike conviction, and one year for the prison prior.

## DISCUSSION

I.      *No Error in Court's Exclusion of* Anderson *Case Evidence*

A.      Background

Defendant's claims of error concern the propriety of the trial court's rulings precluding any reference by defense counsel to the *Anderson* case in (1) the cross-examination of the prosecution's DNA expert, Alan Dixon, (2) the examination of the defense's DNA expert, Marc Taylor, and (3) closing argument.

To properly raise an appellate challenge to the exclusion of evidence, the proponent of the evidence must have made an offer of proof or other sufficient showing to the trial court in support of admission of the evidence. (*People v. Vines* (2011) 51 Cal.4th 830, 869.) "The offer of proof must address the 'substance, purpose, and relevance of the excluded evidence' (Evid. Code, § 354, subd. (a)), and must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued [citation]. The trial court may reject a general or vague offer of proof that does not specify the testimony to be offered by the proposed witness. [Citations.]" (*People v. Carlin* (2007) 150 Cal.App.4th 322, 334; see also *People v. Foss* (2007) 155 Cal.App.4th 113, 127-128.)

The record before us concerning the circumstances of the *Anderson* case was exhibit 2, which consisted of two June 2013 newspaper articles from the San José Mercury News and a July 2013 opinion article from the New York Times. We will deem this to be defendant's offer of proof. As gleaned from that exhibit, on November 30, 2012, Raveesh Kumra died of suffocation at his home in Monte Sereno after being bound and gagged during a home invasion robbery perpetrated by several suspects. Five suspects were arrested, including Lukis Anderson, who was described as a transient. Although not indicated in the newspaper articles, it is apparent from the dialogue between the trial court and the prosecutor in the instant case that Anderson was an acquaintance of other suspects who were arrested in connection with the Kumra home invasion and murder.

According to criminalist Tahnee Mehmet Nelson, Anderson's DNA was found underneath the fingernails of Kumra. But Anderson was released from custody and charges against him were dismissed in June 2013 because his attorney had shown that Anderson, on the evening of Kumra crime, was being treated at VMC. Anderson had been transported to VMC from downtown San José after he lost consciousness due to intoxication. One of the theories explaining the presence of Anderson's DNA on the victim was that the same paramedic who pronounced Kumra dead in his home had transported Anderson to VMC several hours earlier. A second theory involved DNA transfer from a jacket, and a third involved Anderson having been placed in a holding cell with an associate of another suspect in the November 30, 2012 crime. The criminal case against three of the other defendants charged in the Kumra home invasion robbery/homicide was ongoing at the time of trial in this case

Before testimony commenced in this case, defense counsel argued that he was entitled to discovery regarding the *Anderson* case, specifically the analysis in that case concerning the presence of Anderson's DNA on Kumra. Counsel asserted that the requested material showed "inherent vulnerability and weakness [of DNA testing] that

tends to favor Mr. Howell in this case." He argued the material was discoverable and the defense should be permitted to use the DNA analysis to cross-examine the People's DNA expert.

The prosecutor responded that information about the *Anderson* case was not relevant. He represented that he had spoken with the deputy district attorney who had handled the *Anderson* case. The prosecutor argued that the criminalists were not the same in the two cases, and in the present case, there was a videotape record of most of the evidence collection efforts performed by Police Agent Rivera. In addition, the prosecutor represented that the Crime Lab director had conducted an internal investigation and had "concluded there was no cross-contamination in [the *Anderson*] case."

The court denied defendant's request for discovery relating to the *Anderson* case, saying there was "no similarity at all between this case and the *Anderson* case."[2] The court then ruled that the *Anderson* case was "completely irrelevant." But it also said the defense could "present any [DNA] transfer theories as supported by the evidence," and it noted that the defense intended to call "experts in this case who can talk about possible [DNA] transfer without the *Anderson* case."

During cross-examination of the People's DNA expert (Dixon), defense counsel attempted to inquire about "a recent high profile case" involving contamination of DNA samples. The court sustained the prosecution's objection to the inquiry. In later proceedings held outside the presence of the jury, defense counsel again argued the relevance of the *Anderson* case in cross-examining Dixon. He acknowledged that because he had not obtained discovery, he did not know whether the DNA transfer attributed to Anderson resulted from cross-contamination in the field or in the laboratory. The court again ruled that the *Anderson* case was not relevant.

---

[2] Defendant does not challenge the trial court's ruling denying his request for discovery concerning the *Anderson* case.

Before calling his own DNA expert witness (Taylor), defense counsel argued that he should be permitted to include in his examination the circumstances of the *Anderson* case as representing a documented case of in-field DNA contamination. The court confirmed, based on its prior rulings, that defense counsel would not be allowed to refer to the *Anderson* case, "which we have no information on as to exactly what happened . . . and [whether] it was in [the] field as opposed to in the lab [that there may have been contamination]."

After the parties rested, defense counsel requested that the court permit him to mention the *Anderson* case during closing argument. He asserted it was "in the common knowledge of the jurors" since the case had been reported in newspapers. The prosecutor opposed the request, responding that (1) it was an attempt to raise facts not in evidence, (2) the *Anderson* case could not be deemed common knowledge simply because it had been reported in the newspapers, and (3) its introduction was objectionable under "[Evidence Code section] 352 grounds [because] it's confusing [and] speculative." The court ruled that defense counsel could not refer to the *Anderson* case during his closing argument.

### B. Applicable Law and Standards of Review

Only evidence that is relevant is admissible. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) " 'The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Bivert* (2011) 52 Cal.4th 96, 116-117, quoting *People v. Garceau* (1993) 6 Cal.4th 140, 177.) "Accordingly, a 'witness may not be examined on matters that are irrelevant to the issue in the case.' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 640.) The trial court also has the discretionary power to exclude

15

"evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion. (*People v. Harris* (2005) 37 Cal.4th 310, 337.) Although the court " 'has broad discretion in determining the relevance of evidence [citations] . . . , [it] lacks discretion to admit irrelevant evidence.' [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 289 (*Riggs*).) Likewise, the trial court has "broad discretion to weigh the prejudicial impact of testimony against its probative value." (*People v. Lancaster* (2007) 41 Cal.4th 50, 83.) Thus, " '[t]he trial court has broad discretion both in determining the relevance of evidence and in assessing whether its prejudicial effect outweighs its probative value.' [Citation.]" (*People v. Jones* (2011) 51 Cal.4th 346, 373, quoting *People v. Horning* (2004) 34 Cal.4th 871, 900.) An abuse of discretion occurs where it is shown that " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 195; see also *People v. Osband* (1996) 13 Cal.4th 622, 666 [abuse of discretion occurs when trial court's "ruling 'falls outside the bounds of reason' "].)

Generally, an expert witness may base his or her opinion on hearsay (*People v. Pollock* (2004) 32 Cal.4th 1153, 1172 (*Pollock*)), or upon hypothetical facts (*People v. Boyette* (2002) 29 Cal.4th 381, 449). (See Evid. Code, § 801, subd. (b).) But the matter relied upon must "provide a reasonable basis for the particular opinion offered." (*Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564.) And "[a]n expert opinion may not be based on conjectural or speculative matters. [Citation.]" (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115 (*Howard Entertainment*).) The trial court exercises broad discretion in ruling on evidentiary issues concerning expert testimony. (*Pollock*, at p. 1172; see also *Maatuk v. Guttman* (2009)

16

173 Cal.App.4th 1191, 1197 (*Maatuk*) [court has "broad discretion in ruling on foundational matters on which expert testimony is to be based"].)  Thus, a trial court may properly exclude in the examination of an expert "any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value."  (*People v. Montiel* (1993) 5 Cal.4th 877, 919.)  Likewise, the trial court properly sustains objections to expert testimony where it is based " 'on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors.' "  (*People v. Richardson* (2008) 43 Cal.4th 959, 1008.)

"It is settled that the trial court is given wide discretion in controlling the scope of relevant cross-examination."  (*People v. Farnam* (2002) 28 Cal.4th 107, 187 (*Farnam*); see also *People v. Capistrano* (2014) 59 Cal.4th 830, 866 [trial court "has wide latitude to restrict" cross-examination of witnesses].)  This wide discretion will be disturbed on appeal " '[o]nly [upon a showing of] a manifest abuse of the court's discretion.' [Citation.]"  (*People v. Adan* (2000) 77 Cal.App.4th 390, 394.)

C.     Exclusion of *Anderson* Case During Dixon's Cross-Examination

Defendant contends that the trial court deprived him of his constitutional right to present a complete defense by prohibiting him from referring to the *Anderson* case to cross-examine the prosecution's DNA expert (Dixon).  He argues that because "the scope of permissible cross-examination [of experts] is quite broad," and cross-examination may include "evidence not previously admitted at trial or that is otherwise admissible," the trial court abused its discretion and prejudicially erred by denying him the opportunity to cross-examine Dixon concerning the *Anderson* case.  We disagree.

The proffered evidence was not relevant—it was not evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  As presented in the newspaper articles (court's exhibit 2), the *Anderson* case differed in many respects from the instant case.  The suspect, Anderson, had a demonstrated alibi, even though his DNA was at the

17

crime scene and he was an apparent acquaintance of the other arrestees. He was apparently not the subject of eyewitness identification, and he was treated by a paramedic the same evening the paramedic tended to the victim (Kumra) at the crime scene. None of these facts exist in the instant case.

Furthermore, while one theory explaining the presence of Anderson's DNA at the crime scene involved a paramedic's both having treated Anderson and having tended to Kumra, this was one of several theories, and had apparently not been proven. And while both crimes were committed in Santa Clara County and both involved the Crime Lab, the criminalists were not the same. In short, the only matters of commonality between the two cases were the county, the Crime Lab, and a theory—unproven in each case—of possible contamination in the field of the DNA sample linking the suspect to the crime. Thus, the offer of proof presented nothing more than anecdotal evidence of the *possibility* of a DNA sample's contamination in an unrelated Santa Clara County criminal case. The trial court—acknowledging its broad discretion in determining both the relevance of evidence (*Riggs*, *supra*, 44 Cal.4th at p. 289) and in controlling the scope of relevant cross-examination (*Farnam*, *supra*, 28 Cal.4th at p. 187)—did not abuse its discretion by prohibiting defense counsel from introducing the circumstances of the *Anderson* case in his cross-examination of Dixon.

In exercising its discretion to exclude the circumstances of the *Anderson* case, the court indicated it would permit the defense to "present any [DNA] transfer theories as supported by the evidence." In addition to permitting the defense DNA expert (Taylor) to testify at length concerning DNA transfer theories (as discussed, *post*), the court allowed defense counsel's wide-ranging cross-examination of the prosecution's DNA expert (Dixon). Defense counsel, among other things, explored with Dixon the possibility that the various DNA samples from the field were contaminated during the extraction or amplification process in the Crime Lab. And he emphasized that if a DNA sample were somehow contaminated in the field, there would be nothing Dixon could do

18

about it.  Moreover, in his cross-examination of Police Agent Rivera—who qualified at trial as an expert in DNA evidence collection—defense counsel inquired about various mechanisms by which the DNA sample in question (swab from defendant's left-hand fingernails) may have become contaminated at one of the three collection sites (i.e., the crime scene, the hospital, and the police holding cell).  He inquired about the possibility of a DNA transfer by Rivera's (1) use of his camera at all three sites; (2) failure to wash his hands or take proper precautions in using gloves at the three sites; (3) failure to change his clothing during his collection of evidence at the three sites; (4) his collection and handling of the victim's clothing; and (5) use of his cell phone at the holding cell.

Even assuming the existence of any marginal relevance of the circumstances of the *Anderson* case, the trial court did not abuse its discretion to exclude the evidence under Evidence Code section 352, a ground the prosecutor raised when defense counsel sought to refer to the *Anderson* case during closing argument.  Assuming the evidence had some minimal probative value, it was still excludible under Evidence Code section 352 because it would have "necessitate[d] undue consumption of time or . . . confus[ed] the issues, or misle[d] the jury."  Thus, for instance, in *People v. Fuiava* (2012) 53 Cal.4th 622, our high court concluded that the trial court properly excluded evidence of a federal civil suit against sheriff's deputies offered to show that the murder victim, another deputy, may have used deadly force against the defendant that prompted the defendant to shoot him. "In the trial court's view, presenting evidence of the lawsuit and other misconduct by other deputies would be going 'too far afield,' would 'sidetrack' and 'unduly prolong' the trial, and would 'invite[ ] the jury to speculate as to what the lawsuit was about.' " (*Id.* at p. 662; see also *People v. Verdugo* (2010) 50 Cal.4th 263, 291 [evidence of detectives' alleged fabrication of evidence in an unrelated case, charges of which they were exonerated, properly excluded].)  It is well settled that " ' "a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason.  If right upon any theory of law applicable to the case, it must be sustained

regardless of the considerations which may have moved the trial court to its conclusion." [Citation.]' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 976 (*Zapien*), quoting *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.) We therefore conclude—in addition to finding no abuse of discretion in excluding the evidence as not relevant—that there was no error during Dixon's cross-examination in excluding the *Anderson* case under Evidence Code section 352. (See *People v. Geier* (2007) 41 Cal.4th 555, 582 (*Geier*) [holding that, although trial court did not expressly base its ruling on that ground, evidence was properly excluded under Evidence Code § 352].)

   D. Exclusion of *Anderson* Case During Taylor's Direct Examination

Defendant contends the trial court deprived him of his constitutional right to present a complete defense by prohibiting him from using the *Anderson* case to examine his DNA expert, Marc Taylor. He asserts the court's order precluding him from examining Taylor concerning the circumstances of the *Anderson* case was an abuse of discretion. He argues that because the *Anderson* case constituted evidence that "was properly within the scope of expert testimony," and the defense theory of the DNA contamination (through Rivera's handling of several samples) "mirrored the facts of the [alleged DNA contamination in the *Anderson*] case as reported by the [two newspapers]," the evidence should have been allowed. Defendant contends the error was prejudicial, requiring reversal. We disagree.

As noted in part I.C., *ante*, the *Anderson* case was not relevant. The evidence from that case did not "hav[e] any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) It offered only a theory of possible contamination of a DNA sample in a criminal case with circumstances dissimilar from those here. Because the DNA contamination theory in the *Anderson* case could be deemed a "conjectural or speculative matter[]" (*Howard Entertainment*, *supra*, 208 Cal.App.4th at p. 1115), it was proper to exclude it as foundational material that could not "provide a reasonable basis for the particular opinion

20

offered." (*Lockheed Litigation Cases*, *supra*, 115 Cal.App.4th at p. 564.) Exercising its broad discretion in determining both the relevance of evidence (*Riggs*, *supra*, 44 Cal.4th at p. 289) and in ruling on evidentiary questions concerning expert testimony (*Pollock*, *supra*, 32 Cal.4th at p. 1172; *Maatuk*, *supra*, 173 Cal.App.4th at p. 1197), the court did not abuse its discretion by prohibiting defense counsel from introducing the circumstances of the *Anderson* case during his direct examination of Taylor.

We note that the trial court permitted a broad and extensive presentation by the defense DNA expert on the subject of DNA transfer or contamination. On that subject, Taylor testified, among other things, that there were many ways DNA can be transferred, and the level of DNA concentration may vary depending on the nature of the transfer and how much DNA was on the person before the transfer. Taylor explained in detail the various mechanisms by which DNA samples taken by Rivera in this case could have been contaminated at different stages of their analysis at the Crime Lab. He was also examined in detail about a number of mechanisms by which the DNA samples could have been contaminated in the field, including through Rivera's use of his camera and cell phone at different stages of the collection process.

E.    Exclusion of the *Anderson* Case During Closing Argument

Defendant contends the trial court deprived him of his constitutional right to present a complete defense by prohibiting him from using the *Anderson* case during closing argument. He argues that the *Anderson* case, although not in evidence, involved a matter of "common knowledge" such that it was a proper matter of argument by defense counsel.

We first address defendant's contentions concerning the proper standard of review. Defendant contends that the court's exclusion of the newspaper articles during closing argument "automatically constitutes error." Elsewhere in his opening brief, he argues the exclusion "automatically requires reversal." In support of his position that a stringent standard of review should be applied, defendant cites *People v. Woodson* (1964)

21

231 Cal.App.2d 10 (*Woodson*). He argues that *Woodson* supports the proposition that "a court's restriction on the use of *relevant* newspaper or magazine articles during closing argument necessarily constitutes error, so long as it is otherwise *relevant* within the proper scope of argument." (Italics added.) But as we have already noted, the trial court's determination of whether material is *relevant* from an evidentiary standpoint is a highly discretionary matter (*Riggs*, *supra*, 44 Cal.4th at p. 289), and in this instance the court did not abuse that discretion in excluding the evidence concerning the *Anderson* case.

In any event, we do not read *Woodson* to hold that the trial court is restricted in its ability to make rulings limiting the proper scope of argument by counsel. To the contrary, the trial court is vested with discretion pursuant to section 1044 to limit counsel's argument as necessary under the circumstances of the particular case. (*People v. London* (1988) 206 Cal.App.3d 896, 909 (*London*).) We therefore conclude that under the circumstances presented here—i.e., where the court makes a limited intrusion into the substance of counsel's argument, as opposed to one in which the court significantly curtails such argument—the trial court's ruling is reviewed for abuse of discretion. (See *People v. Ponce* (1996) 44 Cal.App.4th 1380, 1388 (*Ponce*); *People v. West* (1983) 139 Cal.App.3d 606, 611 (*West*) ["whether a particular newspaper or magazine article should be read to the jury, is a matter that is addressed to the sound discretion of the trial court"].)

Although a criminal defendant is afforded wide latitude in his or her closing argument (*People v. Farmer* (1989) 47 Cal.3d 888, 922 (*Farmer*), overruled on another point in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6), "it is improper to state facts that are not in evidence during summation, with certain narrow exceptions such as commonly known matters. [Citation.]" (*Farmer*, at p. 922.) Thus, defense counsel may not allude in argument to matters that have not been introduced into evidence. (See *People v. Stankewitz* (1990) 51 Cal.3d 72, 102 [argument that prosecution had failed to

22

call more than one witness to the shooting, even though three others were available, was improper where nothing in the record indicated three other witnesses were available]; *Farmer*, at p. 922 [defense argument raising prosecution's position in another case was improper].) Since there was no evidence concerning the *Anderson* case introduced at trial—and the proposed introduction of such evidence was properly denied by the trial court—the court did not err in instructing defense counsel not to refer to the *Anderson* case during his closing argument.

Contrary to defendant's contention, the *Anderson* case was not a matter of common knowledge, making it a permissible subject for closing argument. As our high court noted long ago, " 'Matters of common knowledge—being things not special to the case in hearing—may, like the language itself, be parcel of the woven argument which the advocate lays before the jury.' " (*People v. Molina* (1899) 126 Cal. 505, 508.) Thus, "[c]ounsel's summation to the jury 'must be based solely upon those matters of fact of which evidence has already been introduced or of which no evidence need ever be introduced because of their notoriety as judicially noticed facts.' [Citations.] He [or she] may state matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature. [Citations.] He [or she] may not, however, under the guise of argument, assert as facts matters not in evidence or excluded because inadmissible. [Citations.]" (*People v. Love* (1961) 56 Cal.2d 720, 730 (*Love*), disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2.)

The *Anderson* case was not a matter of common knowledge. As the trial judge noted, "[the *Anderson* case is] certainly not within any common knowledge of the jury. I would be surprised if any of the jurors were aware of it . . . ." And particularly since the *Anderson* case was properly excluded as evidence during trial, its attempted introduction during closing argument ran afoul of the principle that counsel "may not . . . under the guise of argument, assert as facts matters not in evidence or excluded because inadmissible. [Citations.]" (*Love*, at p. 730.)

23

Defendant points to several cases in which appellate courts concluded that certain magazine and newspaper articles were appropriate subjects for closing argument. (See, e.g., *People v. Guzman* (1975) 47 Cal.App.3d 380, 392, disapproved on other grounds in *People v. McDonald* (1984) 37 Cal .3d 351, 362, fn. 8; *West*, *supra*, 139 Cal.App.3d at p. 610; *Woodson*, *supra*, 231 Cal.App.2d at pp. 15-16; *People v. Travis* (1954) 129 Cal.App.2d 29.) Those cases reflect instances in which the trial court exercised its discretion under particular circumstances. But there is no general rule to the effect that attorneys may refer to newspaper or magazine articles in closing argument, and, as noted, the trial court in its discretion may limit counsel's argument as necessary pursuant to section 1044. (*London*, *supra*, 206 Cal.App.3d at p. 909; see also *Ponce*, *supra*, 44 Cal.App.4th at pp. 1387-1389 [trial court has responsibility to prevent improper argument by all parties, including attempts to present factually unsubstantiated contentions to jury].)

Although during closing argument counsel may "refer the jury to nonevidentiary matters of common knowledge, or to illustrations drawn from common experience, history, or literature [citation], . . . he [or she] may not dwell on the particular facts of unrelated, unsubstantiated cases." (*People v. Mendoza* (1974) 37 Cal.App.3d 717, 725 (*Mendoza*) [trial court properly denied defense counsel license to read newspaper clippings about unrelated crimes, hearsay material which could only confuse the jury with irrelevant facts]; see also *Farmer*, *supra*, 47 Cal.3d at pp. 921-922 [court properly prohibited defense counsel from reading from article when contents were not revealed prior to argument]; *People v. Pelayo* (1999) 69 Cal.App.4th 115, 122 (*Pelayo*) [trial court properly restricted defense counsel's argument by prohibiting reference to newspaper articles about suspect ultimately acquitted of sex crimes against children after discovery that alleged victims fabricated the allegations].)

Here, defense counsel sought to refer to a case not drawn from common knowledge. That case involved an unsubstantiated claim of improper DNA evidence

transfer in the field by a paramedic, which was one of at least three theories concerning the manner in which the accused's DNA was found at the crime scene. Although reference to the *Anderson* case was excluded, defense counsel was permitted to explore at length in his closing argument the crux of his theory concerning the DNA evidence pointing to his client's guilt: that the defendant's left fingernail sample purporting to show both defendant's and the victim's DNA was contaminated during the evidence collection process. The trial court, in the exercise of its discretion under section 1044 to control counsel's argument, did not abuse its discretion in prohibiting reference to the *Anderson* case during closing argument. (*Pelayo*, *supra*, 69 Cal.App.4th at p. 122; *Mendoza*, *supra*, 37 Cal.App.3d at p. 725.)

### F.    Cumulative Error

Defendant argues in the alternative that even if the errors he claims occurred were not enough to warrant reversal, the cumulative effect of such alleged errors was prejudicial. This argument has no merit, "there being no error to cumulate." (*People v. Watkins* (2012) 55 Cal.4th 999, 1036.)

### DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:


_____
Rushing, P.J.


_____
Grover, J.


People v. Howell
No. H040885