Filed 4/20/23 Exteres Corp. v. The Connections Group CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| EXTERES CORPORATION et al., | |
| Plaintiffs and Respondents. | E078245 |
| v. | (Super.Ct.No. RIC1818410) |
| THE CONNECTIONS GROUP, INC., et al., | OPINION |
| Defendants and Appellants, | |

APPEAL from the Superior Court of Riverside County. Chad W. Firetag, Judge. Affirmed.

Reid & Hellyer, Michael G. Kerbs, Jenna L. Acuff, and Douglas A. Plazak for Defendants and Appellants.

Wolff Mascaro and Joshua M. Wolff, for Plaintiffs and Respondents.

A business relationship, founded on verbal agreements, collapsed. The parties to the agreements, who had intended to generate revenue from the sale of a now-patented invention that helps businesses communicate with their customers, disagree whether they ever had a final and binding written contract.

1

Following a lawsuit, a jury found for the plaintiffs, a company and its principal, on several claims against the defendants, who include the inventors of the technology. After adjustments by the trial court, the amended judgment awarded plaintiffs $839,002 in compensatory damages and $1,430,000 in punitive damages. Defendants contend that the trial court erred in various ways during trial and in ruling on the posttrial motions. They request that we reverse the judgment against them and order a new trial or order judgment to be entered in their favor. We affirm the judgment.

## I. FACTS

Defendant and appellant The Connections Group, Inc. (TCGI) provides technology that facilitates communication between businesses and their customers via text messages. TCGI's principals and sole shareholders are defendants and appellants Jay Conrad, Anthony Link, and Mark Sangree.[1] Link and Conrad are the technology's inventors, and they now hold a patent on it; their patent application was still pending during the events here, but it was approved in March 2021. TCGI had an oral, non-exclusive license from Link and Conrad to use the now-patented technology.

Plaintiff and respondent eXteres Corporation (eXteres) provides "reputation management services" for businesses, particularly automotive dealerships. Plaintiff and respondent Richard Winch is the principal of eXteres.

---

[1] Conrad, Link, and Sangree were also the principals of Geo Moment, a predecessor company to TCGI in the same business, using the same technology; Geo Moment was created in January 2016, while TCGI was created in September 2017. Except where specified, we use "TCGI" to refer to both companies.

In mid-2016, the parties began discussing doing business together. By December 2016, eXteres was marketing and reselling TCGI's technology to customers pursuant to an oral license for the technology and an oral revenue sharing agreement. Winch also understood that, in exchange for his "sweat equity," he had been granted the position of Chief Operating Officer (COO) of TCGI and eXteres would receive stock in TCGI.

While they proceeded with business based on their oral agreements, the parties engaged in protracted negotiations for a written agreement. Through 2017 and into 2018, they exchanged multiple drafts of a "Memorandum of Understanding" (MOU).

Link sent a revised version of the MOU to Winch by email on May 24, 2018. Link had signed the document in his capacity as Chief Executive Officer of TCGI. The document had a provision stating that "the MOU has been approved by the TCGI Board of Directors with the approval attached." The attached TCGI "Board Resolution," however, recited that the MOU was adopted at a meeting of the TCGI Board on May 25, 2018—the day *after* it was sent to Winch—and the attachment was signed only by Link, not by its other two members, Conrad and Sangree. The MOU, like its attachment, was dated May 25, 2018. Link's accompanying email stated that the MOU "is set to be dated tomorrow so we can get this executed for both sides." The email noted that Sangree "wants to have a final read-through later tonight to make sure there are not any wording changes," explaining that "'track changes'" had been unintentionally disabled while the latest revisions were being made. Link also wrote that "[a]ny final wording changes will be known by tomorrow so we can get this executed."

Among other things, the May 24, 2018 version of the MOU stated that it is to be considered effective January 1, 2017, regardless of when final signatures are affixed. It granted eXteres a 10 percent ownership interest in TCGI as of May 25, 2018. It gave Winch a seat on TCGI's Board of Directors, effective May 26, 2018, and the position of COO on TCGI's "executive/corporate management team . . . effective January 2017." It provided that TCGI grants eXteres "effective January 1, 2017, a General License . . . to sell [the technology] to the open business market", as well as "effective January 1, 2017, an Exclusive License" in the automotive industry in the United States and Canada. It added that Conrad and Link agree in their capacity as inventors that, once the patent on the technology issues, they will license to TCGI "the exclusive perpetual use of the Patent wherein TCGI will be the majority beneficial owner of the rights to the Patent." It also included revenue sharing provisions applicable to eXteres's use of both the exclusive and the general license for the technology in agreements with third parties.

The parties disagree about what happened after Link's May 24, 2018 email to Winch. According to Winch, he waited for any more wording changes, while "pursuing opportunities and continuing to execute" on the parties' oral agreements. Hearing nothing, on July 11, 2018, he signed the MOU and emailed it back to Link, believing that they had completed a final written agreement. The document Winch sent back to Link included the MOU with his signature added, but not the Board Resolution.

According to Link, on May 25, 2018, Winch called him and expressed that he disagreed with some changes in the latest draft MOU. Link told Winch that Conrad and

4

Sangree would not agree to the MOU without those changes, and indeed they had requested additional changes before final approval. The conversation was contentious and did not result in a meeting of the minds; Link testified that Winch "was yelling and screaming and cussing at me, and then he, basically, hung up." In an email sent on May 26, 2018, Link acknowledged Winch's "desire to remove" a particular provision of the May 24th, 2018 draft of the MOU. Nevertheless, Link wrote, "this clause has to be part of the MOU for [Sangree] and [Conrad] to sign the Board minute[s]," and "[Sangree] is still reviewing the MOU and will probably have additional changes." At trial, Link testified that he was "completely shocked" to receive Winch's July 11, 2018 email, returning the MOU signed and without any changes, given their previous conversation and having heard nothing more in the interim. He was also "taken aback" that Winch was "trying to remove the [Board Resolution] page and pass this off as a valid contract."

On July 16, 2018, the TCGI board of directors (that is, Link, Conrad, and Sangree) met and voted not to approve the MOU. On July 19, 2018, TCGI's counsel sent Winch and eXteres a letter notifying them "that a majority of the Board of Directors voted against approval of the MOU and its contemplated future agreements." The letter requested that Winch "cease and desist from identifying [himself] as either an officer, shareholder, or board member" of TCGI. It also requested that he "refrain from any further contact with entities engaged in existing business relationships with TCGI." Nevertheless, the letter expressed that TCGI was "open to discussions in regard to engaging [eXteres] through a reseller arrangement," particularly as to one specific

company, with which eXteres had a longstanding business relationship. The letter also stated "[a]ny existing revenue sharing contracts" between eXteres and TCGI "would be honored by TCGI."

Winch and eXteres filed their complaint in this lawsuit in September 2018. The operative first amended complaint asserted seven causes of action: (1) declaratory relief; (2) breach of contract; (3) breach of fiduciary duty; (4) tortious interference with contract; (5) intentional interference with prospective economic relations; (6) intentional misrepresentation; and (7) negligent misrepresentation.

The jury's findings on the contract and tort causes of action, expressed on a detailed special verdict form, largely favored plaintiffs. The jury found the defendants liable on each cause of action except intentional interference with prospective economic relations. The jury was instructed to determine damages for each cause of action separately, without considering whether they were duplicative. Thus, the jury awarded these compensatory damages: (1) for breach of contract, $678,049; (2) for breach of fiduciary duty, $839,002; (3) for tortious interference with contract, $745,875; (4) for intentional misrepresentation, $148,371; and (5) for negligent misrepresentation, $148,371. In the judgment, to "avoid duplicative damages," the trial court limited the plaintiffs' "compensatory recovery . . . to $839,002, jointly and severally, against (a) [TCGI, Link, Sangree, and Conrad] for $745,875 and (b) [Link, Sangree, and Conrad] for $93,127." The amount of $839,002 is, to the dollar, the amount plaintiffs' expert Eric

6

Lane calculated to be the value of a 10 percent interest in TCGI, based on the value of forecasted royalties from Link and Conrad's patent, adjusted to present value.

Along with compensatory damages, the jury also decided punitive damages were appropriate: (1) against TCGI, $22,301,617; (2) against Link, $38,734,388; (3) against Sangree, $17,606,540; and (4) against Conrad, $38,734,388. This punitive damages award totaled $117,376,933, which, to the dollar, is the amount Lane described as the patent's "Forecasted Royalty Collections over 15 years." In testimony, Lane explained that this amount represents the "sum of the [projected] royalty collections" from Link and Conrad's patent without any "discount" for risk or adjustment to present value, as forecasted by another expert for plaintiffs, Don Feuer. In the initial judgment, however, the trial court "[b]y stipulation of Plaintiffs and order of the Court" awarded reduced punitive damages as follows: (1) against TCGI, $400,000; (2) against Link, $1,500,000; (3) against Sangree, $325,000; and (4) against Conrad, $1,500,000.

Defendants brought posttrial motions for new trial and judgment notwithstanding the verdict. The trial court granted in part and denied in part the motions. It found insufficient evidence that Conrad or Sangree had made any misrepresentations to Winch or eXteres, and therefore granted judgment notwithstanding the verdict in their favor as to those causes of action and struck the corresponding damages awards. Based on evidence of the individual defendants' net worth, and with the consent of plaintiffs, the trial court ordered their punitive damages further reduced, to $450,000 each for Link and Conrad

7

and $130,000 for Sangree. The trial court denied the motions in all other respects. An amended judgment was entered accordingly.

## II. DISCUSSION

### A. Excessive damages

Defendants contend that rather than reduce the jury's excessive award of damages, the trial court should have instead ordered a new trial. In their view, the damages award was so excessive it must have been the product of passion or prejudice that infected not only the jury's decisions about that award, but also liability. We are not persuaded.[2]

Generally, rulings on new trial motions are reviewed for abuse of discretion. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859.) Nevertheless, "any determination underlying any order is scrutinized under the test appropriate to such determination." (*Ibid.*) Here, the trial court denied defendants' motion for new trial, but only after reducing the punitive damages award with plaintiffs' consent. That reduction was an exercise of the court's discretion under Code of Civil Procedure section 662.5, which provides that a court that would otherwise grant a new trial due to excessive damages may instead "make its order subject to the condition that the motion is denied if

---

[2] On the other hand, we find unpersuasive plaintiffs' contention that defendants forfeited the argument that the damage award was excessive by failing to raise it in the trial court. In requesting a new trial, defendants argued that "the jury's verdict with respect to all of Plaintiffs' claims was tainted by passion and prejudice . . . ." The trial court denied defendants a new trial on that basis (or any other), and instead reduced the jury's damages award. It is appropriate for defendants to now argue that decision was in error. Certainly, defendants' arguments on appeal are framed somewhat differently than their trial court arguments. But that is not enough for us to refuse to consider their arguments on the merits, whether as a matter of law or in our discretion.

the plaintiff consents to a reduction of the award to an amount that the court independently determines to be fair and reasonable." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 688 (*Bullock*); see Code Civ. Proc., § 662.5, subd. (a)(2).) "A court exercising this authority acts as an independent trier of fact." (*Bullock*, *supra*, 159 Cal.App.4th at p. 688; see *Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 882-883 [trial court sits as 13th juror in determining whether damage award was excessive].)  "We must affirm the court's decision if the court states adequate reasons for the decision and substantial evidence supports the decision." (*Bullock*, at pp. 688-689; see *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412; *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 931-933, & fn. 18 (*Neal*).)

Importantly, "when a trial court grants a new trial on the issue of excessive damages, whether or not such order is conditioned by a demand for reduction, the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order." (*Neal*, *supra*, 22 Cal.4th at p. 932.) "Accordingly, the relevant amount for purposes of our review is not the amount awarded by the jury, but the reduced amount ordered by remittitur." (*Bullock*, *supra*, 159 Cal.App.4th at p. 689.)  Thus, defendants' focus here on the excessiveness of the jury's damages awards before reduction is mistaken.

Defendants have not attempted to articulate any reason why even the reduced punitive damages awarded by the trial court might still be excessive.  Although the jury was prepared to award more, plaintiffs only ever sought $400,000 in punitive damages

9

against TCGI, and defendants never challenged that amount as excessive in the trial court, let alone on appeal. In the trial court, *defendants* persuaded the trial court *and plaintiffs* that $450,000 was the "absolute most that could be applicable for punitive damages for Link and Conrad," based on the present value of the patent. Defendants have not argued that the trial court's finding that Sangree's approximate net worth was $1.3 million lacks the support of substantial evidence, or that a punitive damages award of 10 percent of that amount ($130,000) is excessive.

As to compensatory damages, defendants contend the amounts awarded "demonstrate that the jury . . . merely adopted wholesale" the testimony of plaintiffs' experts. It is not apparent, however, why this alone might tend to show the award to be excessive, or show that the jury "lost sight of the law and the facts" in deciding liability, as well as damages, as defendants assert. On the contrary, it shows the jury grounded its compensatory damages awards in the evidence presented to it. A jury may give an expert's opinion "the weight which it finds that opinion deserves." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633.) Defendants' fundamental point here is not that the jury came up with a compensatory damages award that was pure "surmise and conjecture" in the sense of lacking any support in the record, but that the experts' opinions were so flawed that the trial court should have excluded them from evidence. If this were so, however, the jury's adoption of the experts' opinions would tend to show prejudice from evidentiary error, not that the jury was carried away by passion or

10

prejudice. The merits of defendants' claims of evidentiary error are separate questions, which we address below.

Defendants' reliance on the dissent in *Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 321-326 (J. Traynor, dissenting) (*Sabella*) is misplaced. Defendants quote the *Sabella* dissent for the proposition that "[w]hen appeals to passion and prejudice may have influenced a verdict, they may have influenced it on the issue of liability as well as on the issue of damages." (*Id.* at p. 326.) In *Sabella*, however, the plaintiff's counsel had employed several blatantly improper arguments to appeal to passion and prejudice. (*Id.* at p. 325.) Defendants have not argued that plaintiffs' counsel here engaged in any similar misconduct that might have deprived defendants of "the right to an impartial trier of fact and the correlative right to a trial free of appeals to passion and prejudice." (*Id.* at p. 326.) The quoted language, even if a correct statement of the law where applicable, does not help defendants here.

We conclude that defendants have not shown that the trial court abused its discretion under Code of Civil Procedure section 662.5, subdivision (a)(2), to reduce the jury's excessive award of damages rather than order a new trial.

## B. Admission of Expert Testimony

Defendants contend that the trial court erred by admitting "unreasoned, unreliable, and speculative expert testimony" by plaintiffs' experts Don Feuer and Eric Lane regarding several categories of damages. (Bolding and capitalization omitted.) We find

11

no abuse of discretion in the trial court's decision to admit the testimony and allow the jury to decide what weight the testimony deserved.

1. *Additional background*

At trial, the defense presented no expert testimony about the value of Link and Conrad's patent. In contrast, Feuer testified as an expert for plaintiffs "to evaluate the technology in question and to place a value" on it. He described his background in the telecommunications industry, which included experience as an inventor and "build[ing] technology companies." He had experience in bringing new technologies to market. He had previously run "an SMS texting company." He was CEO of a "patent-holding company," to which he had assigned his own patents, and which "is involved in litigating against other telecommunications companies."

Feuer stated that he is "not a professional patent evaluator," but that he is "an expert in terms of what patents are viable and which are not." Feuer viewed Link and Conrad's patent as a "valuable thing" and a "big deal." Based on his research, he believed that their then-pending patent application had priority over potential competitors. As to value, Feuer described the considerations he believed a non-practicing entity would use in deciding on a purchase price for the patent, if it were to be sold. He estimated a 15-year commercial lifespan for the technology.[3] He testified as to the size of the mobile advertising market, in which the technology would be used, as well as

---

[3] Feuer opined that, although a patent like Link and Conrad's protects their invention for 20 years, it does not make sense to project profits that far into the future, because "[y]ou don't know if there will be some disruptive technology that comes out."

12

projections for that industry's growth. He forecasted the "utilization rate" that he expected for the patent over time, representing the patented technology's penetration into the mobile advertising market as the "minor fraction" of the total mobile advertising market that would be dedicated to royalties for using the patented technology. His forecast of the royalty potential of the patent separated out expected royalties from licensing and litigation settlements from royalties recovered through judgments after trial, to account for the extra expense of litigation.

During Feuer's testimony, on cross examination, he estimated that if Link and Conrad were to sell their patent, "it would probably sell for 5, $10 million today." Feuer, however, provided his "data" to Lane, a certified public accountant and business appraiser who also testified as an expert witness for plaintiffs. Lane used the numbers Feuer provided to calculate a more precise value than Feuer's view of the sale price. Lane took the total potential royalties forecasted by Feuer and discounted them to present value using a "reasonable discount rate that a private investor would expect investing in some kind of new technology." Lane determined the "Present Value Discounted Royalty Collections" of the patent to be $8,390,017, an amount he described as the "forecasted revenue stream" for the patent, discounted to present value. From that, he calculated a 10 percent interest to be $839,002, which is the amount the jury awarded to plaintiffs on the breach of fiduciary duty claim.

Lane's opinions also included a "forecast" of the profits that eXteres would have received from certain contracts with third parties if defendants had not tortiously

13

interfered. Lane calculated projected revenue and expenses for six years, from July 2018 through June 2024. He testified that he chose that length of time based on discussions with Winch: "We didn't want to reach too far out in the future, but six years is a decent mid-term event where [Winch] felt he could reasonably forecast the minimum revenue that he could have achieved." Lane's opinions about the likely growth rate of revenue from the contracts, as well as eXteres's expenses, were also calculated from information he received from Winch. Lane concluded that eXteres's lost profits over the six-year period, with future profits adjusted to present value, amounted to $3,231,238. The jury awarded plaintiffs a lesser amount on the tortious interference claim, allocating $740,875 to one contract and $5,000 to another (roughly a quarter of the amounts suggested by Lane's calculations), and finding no liability or damages for two other contracts.

Lane also calculated the value of plaintiffs' time and money spent during eXteres's relationship with TCGI during the period from June 2016 through July 2018, which they sought as pre-contract damages on their breach of contract claim. Again, his calculations started from information provided by Winch. Winch reviewed his records to create a "chronological time line" of meetings, travel, and other activities he personally engaged in as part of the "TCGI project," and had his office "match up" those activities with receipts for expenses associated with those activities. Winch also estimated the percentage of time that he and various eXteres employees spent each month on the project. From Winch's itemized chronology, Lane calculated the total time that either Winch or other eXteres staff spent, using task-specific "assumptions" based on his

14

"business experience" of how much time should be allocated to, for example, a text, or an email, or a business meeting. To that total amount of time, he applied a "blended" hourly rate derived from an industry survey, and he added travel expenses to determine a "Total Reimbursement" figure. For comparison, Lane also made calculations starting from Winch's estimates of percentages of time he and eXteres staff had spent monthly, resulting in an alternative amount. The jury apparently adopted the calculations starting from Winch's itemized chronology as the basis for its award of damages for breach of contract.[4]

2. *Applicable Law*

The trial court has a "substantial 'gatekeeping' responsibility" to ensure that an expert's opinion is based on both reliable material and sound reasoning. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769 (*Sargon*).) The court "may inquire into, not only the type of material on which an expert relies, but also whether that material actually supports the expert's reasoning." (*Id.* at p. 771; Evid. Code, §§ 801 [governing judicial review of the subject of expert testimony and type of matter the expert relied on in "forming an opinion"], 802 [governing judicial review of the "reasons" for expert's opinion].) "The court must not weigh an opinion's

---

[4] As noted, the jury awarded plaintiffs $678,049 on the breach of contract claim. To the dollar, that is the amount Lane calculated starting from Winch's itemized chronology to be the appropriate "Total Reimbursement" amount ($491,621) plus pre-trial interest. The analogous amount that Lane calculated for comparison, based on Winch's estimates of percentages of time spent, was $593,484 ($437,716 plus interest). Winch's own, lay opinion was that the appropriate "aggregate number" was "$700,000 to $800,000."

probative value or substitute its own opinion for the expert opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Sargon*, *supra*, at p. 772.)

"'The trial court must exclude expert opinion testimony 'that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative.'" (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 571, quoting *Sargon*, *supra*, 55 Cal.4th at pp. 771-772.) Nevertheless, some areas that are properly the subject of expert opinion, such as lost profits, are "always speculative to some degree." (*Sargon*, at p. 775.) "Courts must not be too quick to exclude expert evidence as speculative [. . . .] A reasonable certainty only is required, not absolute certainty." (*Ibid*.)

The trial court's discretion to exclude or admit expert testimony under Evidence Code sections 801 and 802 is broad. We may overturn the court's decision only if we conclude it was arbitrary or irrational. (*Sargon*, *supra*, 55 Cal.4th at p. 773.)

3. *Analysis*

a. *Patent valuation*

We do not find the trial court's decision to admit Feuer's testimony about the value of Link and Conrad's patent arbitrary or irrational. Feuer's experience in the industry, both as an inventor of patents and an entrepreneur running businesses built around patented technology, and including both practicing and non-practicing entities, is

16

substantial. He testified that the factors he considered in making his forecasts about future royalties were those a potential purchaser of the patent would consider in determining a reasonable purchase price if the patent were to come up for sale. On its face, there is nothing unreasonable about valuing a patent (and by extension a business built around that patent) by such a measure.

Defendants criticize some of the numbers that Feuer used as speculative or without foundation. While this criticism certainly supports a basis for vigorous cross-examination of Feuer as to how much leeway his numbers permit, we do not find Feuer's testimony so speculative as to have compelled the trial court to exclude it.[5] The patent had *some* value, and Feuer provided reasoning with an adequate foundation to establish with a reasonable degree of certainty what that value is. For example, Feuer's projections about the growth of the mobile advertising market were based on "analyst reports," one of which he identified by author. That is the sort of published information experts routinely rely on in developing their opinions. (See *Maatuk v. Guttman* (2009) 173 Cal.App.4th 1191, 1198 (*Maatuk*) ["an expert may rely on any information of the type reasonably relied on by an expert, even if it is hearsay, and from a nonexpert"]; Evid. Code, § 801, subd. (b).) Any lack of specificity regarding Feuer's sources "simply affected the testimony's weight and could have been probed in cross-examination at trial." (*People ex rel. Dept. of Transp. v. Clauser/Wells Partnership* (2002) 95

---

[5] We are not addressing here whether the trial court *could have* exercised its discretion to exclude Feuer's testimony as too speculative or lacking in foundation.

Cal.App.4th 1066, 1086.) Similarly, Feuer's forecast of the fraction of that market that Link and Conrad's patented technology would capture as royalties was based on his "experience" in the relevant market. (Cf. *Maatuk*, *supra*, 173 Cal.App.4th at p. 1198 [excluding expert's assumptions about market penetration in part because she "did not testify to any expertise on the market"].) Defendants criticize Feuer for ignoring available "historical data" of "actual revenues" showing royalties the patent had generated to date, and a lack of other specific sources. Feuer's experience, however, included close attention to how patents he viewed as analogous have tended to perform over time, informing how he expected Link and Conrad's patent would do. Comparison with arguably analogous patents is different from pure speculation. Feuer's expressed reasoning for how profitable he expected patent enforcement efforts would have been is hardly unassailable. Nevertheless, he runs a patent holding company, which generates revenue from such efforts, so the issue is squarely within his area of expertise.

Defendants were, of course, free to present evidence showing Feuer's reasoning to be wrong and to point out to the jury any arguable holes in his reasoning through cross-examination and argument. That Feuer's testimony might be susceptible, at least in some respects, to such challenges does not demonstrate that the trial court was compelled to exclude the testimony altogether. (See *Ventura County Flood Control Dist. v. Security First Nat. Bank* (1971) 15 Cal.App.3d 996, 1004 ["Where it appears that the opinion of a valuation witness is based upon considerations which are proper as well as those which are not, the testimony may be admitted and the trier of fact shall determine its weight and

credibility"].)  Defendants could argue to the jury, for example, that Feuer's testimony could reliably establish only a lesser amount of damages than what he asserted, or even that the jury should give the testimony no weight at all.

Defendants criticize Feuer's method of valuing the patent on the ground that he did not apply the so-called "*Georgia-Pacific* factors," which are often used in federal courts to determine statutory damages for patent infringement. (See *Uniloc USA Inc. v. Microsoft Corp* (Fed. Cir. 2011) 632 F.3d 1292, 1317-1318 (*Uniloc*) [Federal Circuit has "sanctioned the use of the *Georgia-Pacific* factors" in determining statutory patent infringement damages]; *Georgia-Pacific Corp. v. U.S. Plywood Corp.* (S.D.N.Y. 1970) 318 F.Supp. 1116, 1120 (*Georgia-Pacific*).)  This case, however, is not governed by federal law about statutory damages for patent infringement.  Defendants cite no California authority requiring an expert to use the *Georgia-Pacific* factors in circumstances like this case, and we are aware of none.  And for good reason; the *Georgia-Pacific* factors are evidentiary facts relevant to determining how a hypothetical negotiation of a "reasonable royalty" would have turned out, had the parties engaged in such a negotiation.  (35 U.S.C. § 284; *Uniloc*, *supra*, 632 F.3d at p. 1317; *Georgia-Pacific*, *supra*, 318 F.Supp. at p. 1120.)  It is not at all apparent that a patent must be valued only by that measure in contexts other than determining statutory damages for patent infringement under federal law.  Indeed, even in the context of a federal patent infringement matter, "there are ways of determining a reasonable royalty other than through the *Georgia-Pacific* factors." (*Exmark Manufacturing Co. Inc. v. Briggs &*

19

*Stratton Power Products Grp., LLC* (Fed. Cir. 2018) 879 F.3d 1332 (*Exmark*).)

Certainly, defendants could have presented expert testimony of their own, contesting Feuer's methodology. Such evidence, however, would have raised only a factual question for the jury regarding what methodology was more appropriate.[6] (See *People ex rel. Dept. of Transp. v. Clauser/Wells Partnership*, *supra*, 95 Cal.App.4th at p. 1083 [in eminent domain action, "whether the specific circumstances of [defendants'] business warranted application of [expert appraiser's] methodology [for valuing the business] was a factual question for the jury. However, although any 'just and equitable' method could be proper, the jury would remain 'free to accept or reject' [the expert's] valuation"].)

The Federal Circuit's reasoning in *Exmark*, *supra*, 879 F.3d 1332, emphasized by defendants, does not persuade us that the trial court was compelled to exclude Feuer's testimony. In *Exmark*, a federal patent infringement matter, the plaintiff's expert opined that the appropriate hypothetical royalty rate to use in calculating damages was 5 percent. (*Id.* at p. 1349.) The expert recited the *Georgia-Pacific* factors and discussed them in a superficial manner. (*Exmark*, at pp. 1350-1351.) The expert's opinion was, however, "devoid of any analysis tying either the evidence or the specific *Georgia-Pacific* factors to the proposed 5 percent royalty rate." (*Id.* at p. 1351.) Among other things, the

---

[6] We note also that Feuer's testimony just *is* the opinion testimony of a qualified expert, which is one of the 15 *Georgia-Pacific* factors. (*Georgia-Pacific*, *supra*, 318 F.Supp. at p. 1120.) We infer that the *Georgia-Pacific* factors are useful for evaluating a party's evidence of damages for patent infringement as a whole, but they do not necessarily speak to the admissibility of any particular expert's opinion, particularly outside the context of a patent infringement action.

evidence that the expert failed to analyze included a comparable, but non-hypothetical, settlement agreement, the parties to which had agreed to a royalty rate of 3.64 percent. (*Id.* at p. 1349)  The Federal Circuit concluded that the expert's opinion, based on a 5 percent royalty rate "plucked . . . out of nowhere," should have been excluded from evidence because it "lacked sufficient ties to the facts of the case." (*Id.* at p. 1351.)  In contrast, as discussed, Feuer's opinions, while debatable, were not plucked from nowhere, but derived from his experience with other patents he viewed as comparable. There were ample grounds for defendants to dispute the strength of that foundation supporting Feuer's conclusions.  But we do not find it irrational or arbitrary for the trial court to have allowed the jury to make the determination of how much weight Feuer's testimony deserved in determining the value of the patent.

Defendants further contend that Lane's testimony about the patent's value should have been excluded "for the same reasons [Feuer's] testimony should have been excluded."  Because we are not persuaded by defendants' arguments as to Feuer, we reach the same conclusion as to Lane.  Defendants have not demonstrated that the trial court abused its discretion by admitting the testimony of either Feuer or Lane as to the valuation of Link and Conrad's patent.

b. *Lost profits*

Defendants contend that Lane's forecast of eXteres's lost profits resulting from defendants' tortious interference with contract should have been excluded from evidence

as speculative and "unhelpful to the jury." We find no abuse of discretion in the trial court's decision to allow the jury to decide what weight to give the testimony.

As defendants emphasize, Lane's forecast of lost profits does not rest on available data regarding actual revenues from the contracts at issue, either during the period from 2016 to 2018 when eXteres acted as a middleman between TCGI and customers, or the period from 2019 to 2021 when TCGI was dealing with the customers directly. It is not apparent, however, why *actual* revenues are the only reasonable basis for determining what would have happened in a *hypothetical* situation, that is, what the revenue would have been absent TCGI's tortious interference. The point of the business relationship between TCGI and eXteres was to try to achieve greater profits than TCGI would be able manage on its own by leveraging eXteres's experience and expertise, including its preexisting client relationships.[7] Arguably, the difference between actual and hypothetical revenues is not a sign of any flaw in Lane's forecasts, but a measure of the value of eXteres's efforts to market the technology.

Similarly, defendants emphasize that Lane's lost profits forecasts derived from information he received from Winch, rather than independently gathered or verified data. It is not apparent, however, why that alone might render Lane's calculations so unreliable as to be "entirely speculative," as defendants propose. Winch had personal knowledge of the contracts and client relationships at issue, and thus some foundation to describe them

---

[7] For example, the bulk of damages awarded for tortious interference related to a contract with a company that already had a decade-long business relationship with eXteres before signing on to use TCGI's technology.

with reliability to Lane including, at least arguably, projections of how things would likely have developed without defendants' interference. Certainly, Winch's information was subject to challenge, for example, as biased or excessively optimistic. But Winch was available for cross-examination on these or other purported defects, and the reasonableness of Winch's information, on which Lane relied, is a question of fact. (See, e.g., *Sargon*, *supra*, 55 Cal.4th at p. 774 ["'[A]lthough generally objectionable for the reason that their estimation is conjectural and speculative, anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability'"].) It was within the bounds of the trial court's discretion to leave it to the jury to decide how much weight Lane's opinions should be given based on any deficiencies in the information underlying them.

Defendants' arguments in favor of a different conclusion based on *Sargon*, *supra*, 55 Cal.4th 747, are not persuasive. In *Sargon*, our Supreme Court upheld a trial court's exercise of discretion in its role as "gatekeeper" to "exclude speculative expert testimony." (*Id.* at p. 781.) We face a different question, whether the expert's opinions were so unreasonable that the trial court was *required* to exclude them. Thus, deference to the trial court's discretion requires we view Lane's testimony generously, whereas *Sargon*'s circumstances required the opposite perspective.

Furthermore, the expert testimony excluded in *Sargon* differed from Lane's testimony in that it was unreliable and poorly reasoned. In *Sargon*, the expert purported to compute lost profits via a market share approach, comparing the plaintiff company to

six large, multinational companies that were the dominant market leaders in the relevant industry for dental implants. (*Sargon*, *supra*, 55 Cal.4th at p. 756.) The expert, who was a certified public accountant and attorney, testified that if there had been no breach of contract by the defendant, the plaintiff would have grown from a three-person operation with no market share to one of the industry leaders, in part by investing in research and development on new products not yet invented. (*Id.* at pp. 755, 765-766.) This testimony was grounded solely in the expert's "belief," unsupported by evidentiary facts or relevant expertise, that the plaintiff was "innovative, and that innovation was the prime market driver." (*Id.* at p. 777.) The expert offered no rational basis to conclude that the plaintiff would become a market leader, let alone any rational basis for the jury to decide whether that would mean, say, a 4 percent share or a 20 percent share of the market. (*Id.* at pp. 777-778.) The Supreme Court agreed with the trial court's decision to exclude such "'faith-based'" predictions. (*Id.* at pp. 766 [quote], 781.) Winch's predictions about lost profits, in contrast, were founded on more measured reasoning, based not only in knowledge of the technology and the industry, but the specific contracts and client relationships that defendants were alleged to have disrupted. While his predictions about what would have happened without the interference are not unassailable, they are not nearly so speculative as that of the expert in *Sargon*.

Defendants have demonstrated no abuse of discretion in the trial court's decision to admit Lane's testimony about lost profits.

### c. *Pre-contract damages*

Defendants contend that Lane's calculations relating to eXteres's pre-contract damages arising from time and money spent in the period from June 2016 through July 2018, before the MOU, should have been excluded because the testimony "added nothing but improper unfounded emphasis to Winch's testimony." This argument does not merit extended discussion. It is implausible, to say the least, that ordinary jurors are as capable as a certified public accountant to take raw data of itemized receipts and time records and calculate an appropriate dollar amount to represent total expenses. (Cf. *Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1169 [proper to exclude expert testimony when "'''"the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness"'''"].) Moreover, even if some jurors might be able to manage the task, it is reasonable to conclude that it would still be helpful to have an expert perform the calculations. (See *ibid.* ["'''"expert opinion may be admitted whenever it would 'assist' the jury"'''"].)

Similarly, defendants are correct that "the proper role of expert testimony is to help the jury understand the significance of case-specific facts proven by competent evidence, not to place before the jury otherwise unsubstantiated assertions of fact." (*People v. Valencia* (2021) 11 Cal.5th 818, 837.) It is not apparent, however, why this principle should bar Lane's testimony. Lane did not serve as a proxy to smuggle in evidence of case-specific facts from an absent witness. (Cf. *id.* at p. 839-840 [gang expert's recitation of facts of predicate offenses of which he had no personal

knowledge].)  He did not rely on the opinion of another, absent expert in an "uninformed" manner and in the absence of any basis in the record that would justify such reliance.  (Cf. *San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 963.)  Rather, he took raw data showing hours spent and expenses incurred and performed his own analysis, relying on his own expertise, to produce a dollar amount representing the total cost of the activities.  Defendants have not shown that Lane's testimony fell outside the proper role of expert testimony.

## C.  Time and cost damages

The only damage award that plaintiffs sought on their contract claim was recovery for their pre-contract expenses; Lane presented the jury with two alternative calculations of such expenses, and the jury chose one of them as the amount of the contract damages.  Under the judgment proposed by plaintiffs and adopted by the trial court, as well as the later amended judgment, this amount was awarded only in the alternative to other forms of damages arising from other causes of action, such as the lost profits sought for interference with contract.  Defendants argue that these "time and costs damages" for breach of the MOU were "unrecoverable" because those expenses would have been incurred under the parties' oral agreements.  Plaintiffs contend this argument was forfeited by failing to raise it in the trial court, and that it is in any case without merit.  We do not find the argument forfeited.[8]  We do find it unpersuasive.

---

[8]  In defendants' new trial motion, they argued that the time and cost expenses did not amount to an "actual loss" caused by breach of contract, but rather were "in service of" contracts with clients obtained under the parties' oral agreements or in "an attempt to

*[footnote continued on next page]*

26

"One proper 'measure of damages for breach of contract is the amount expended [by the nonbreaching party] on the faith of the contract.'" (*Agam v. Gavra* (2015) 236 Cal.App.4th 91, 105 (*Agam*); see also 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 883, p. 970 [one measure of contract damages "is the amount of the plaintiff's expenditures, together with the reasonable value of his or her own services, in preparation and performance in reliance on the contract"].) Initially, "the burden is on the plaintiff to establish 'the amount which he has been induced to expend.'" (*Agam*, *supra*, 236 Cal.App.4th at p. 106.) "The burden then shifts to the defendant to show the nonbreaching party's expenses were unnecessary, such that his or her recovery of reliance damages should be reduced." (*Ibid.*) The recovery may also be reduced if the defendant can show plaintiffs "would have suffered a loss even if the defendant had fully performed." (*Ibid.*) There is a "rebuttable presumption," however, "'that complete performance of the agreement would . . . have resulted in at least reimbursing the injured party for his outlay fairly made in performance of it.'" (*Id.* at p. 107)

Defendants have not attempted to show that plaintiffs' expenditures of time and money were unnecessary. In other contexts, as discussed, defendants have disputed plaintiffs' projections of how much revenue would have been generated if the parties' business relationship had continued. Defendants have not, however, specifically argued that revenues would have been inadequate even to reimburse plaintiffs for their claimed expenditures.

_____

obtain" such contracts, "of which Plaintiffs received 50 percent of the net proceeds." This is fundamentally the same argument as the one defendants have raised on appeal.

Instead, defendants argue that plaintiffs' expenditures should not be viewed as initial outlays relying on the expected MOU, but rather as being in service of entirely separate contracts—the parties' oral agreements. Defendants have not articulated, however, why the jury (and, on the new trial motion, the trial court) might have been required to accept that framing of the issue. There is evidence supporting the different conclusion that the parties' oral agreements—though also valid and enforceable as contracts in their own right—were precursors, organizing the parties' initial dealings during a preparatory phase, but not independent of the MOU. Among other things, Winch's testimony supports that view of what occurred. He stated that "ultimately we intended for there to be a final agreement at some point in the future that would memorialize the entire span of time that our oral agreement and these drafts were taking place . . . We just didn't know at that moment in time when that would take place." The terms of the MOU itself—including its backdated effective date of January 1, 2017, and incorporation of many terms from the parties' oral agreements that were effective during the same period—support the same conclusion.

Defendants emphasize that the jury was instructed using CACI No. 1923 that plaintiffs may recover amounts "spent in reliance on Appellants' misrepresentations" only "'if those amounts would not otherwise have been spent.'" This argument, however, muddles together two different types of reliance damages. CACI No. 1923 relates to damages arising from reliance on tortious misrepresentations. The pre-contract expenses here flow not from any misrepresentations, but from the defendants' breach of a contract

28

(the MOU), representing plaintiffs' expenditures in preparation for that contract. The jury was properly instructed on the law relating to that sort of reliance damages using CACI No. 361. The question in the contract context is not whether the "amounts would not otherwise have been spent" (CACI No. 1923), but whether eXteres "would have suffered a loss" even if TCGI had "fully performed its obligations under the contract" (CACI No. 361). Those different questions lead to different answers, as reflected here in the jury's awards of compensatory damages for breach of contract ($678,049) and tortious misrepresentation ($148,371).

We conclude that defendants have not shown any appropriate basis for us to disturb the jury's award of contract damages.

## D. Inconsistent jury findings

Defendants argue that the jury's finding of liability on the breach of contract cause of action contradicts its findings of liability on the intentional and negligent misrepresentation causes of action. It does not.

In civil cases, "a fact finder may not make inconsistent factual determinations based on the same evidence."[9] (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 707].) "On appeal, we review a special verdict de novo to determine whether its findings are inconsistent." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186

---

[9] The rule is different in criminal cases, where "[t]he law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt and juries the power to acquit whatever the evidence." (*People v. Palmer* (2001) 24 Cal.4th 856, 860.)

Cal.App.4th 338, 358.) "A special verdict is inconsistent if there is no possibility of reconciling its findings with each other." (*Id.* at p. 357.) "With a special verdict, unlike a general verdict or a general verdict with special findings, a reviewing court will not infer findings to support the verdict." (*Id.* at p. 358.) We are "'not permitted to choose between inconsistent answers.'" (*Ibid.*) Rather, "the proper remedy for an inconsistent special verdict is a new trial." (*Ibid.*)

The first premise of defendants' inconsistency argument is that, to find for plaintiffs on the breach of contract claim, "the jury necessarily had to find that the MOU had been approved by the [TCGI] Board . . . ." The second premise is that the jury must also have found that the Board did *not* approve the MOU, since "the only basis for fraud was the purported misrepresentation in the MOU that the MOU had been approved by the TCGI Board." They conclude on that basis that the jury returned irreconcilable verdicts, which must be reversed.

The validity of defendants' syllogism turns on whether the first premise is true. In our view, it is not. The jury was not asked to make an express finding that the TCGI Board had approved the MOU. The special verdict only asked the jury to decide: "Did [TCGI] agree to the terms of the contract?" There is some basis to find that it did: Link signed the MOU in his capacity as Chief Executive Officer of TCGI.[10] "Under statutory

---

[10] We do not know if this is the theory argued to the jury by plaintiffs, as the parties' opening statements and closing arguments are not part of the trial transcript in our record. The trial court did not have a court reporter available for those portions of the proceedings, and the parties apparently chose not to provide their own.

30

law, an officer can bind the corporation in dealings with third parties in which the officer has actual or *apparent* authority." (*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.* (2000) 83 Cal.App.4th 409, 421, disapproved on other grounds by *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1154; Corp. Code, § 208, subd. (b); see also *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 137 ["Larger corporations often have formal board committees to recommend the approval of a variety of contracts. But small corporations . . . conduct much of their official business informally. . . . The practice of allowing officers to approve contracts is so prevalent in some close corporations, for example, that they bind the entity even though the officer should have obtained board approval"].)

Thus, as relevant here, the jury found that TCGI—implicitly, Link, on behalf of TCGI—agreed to the following term: "TCGI represents the MOU has been approved by the TCGI Board of Directors with the approval attached." On its face, there is no irreconcilable conflict between the propositions that (1) TCGI *represented* that the MOU had been approved by the TCGI Board and (2) the representation in the MOU that the TCGI Board had approved the MOU was false. Indeed, that is just plaintiffs' version of what happened.

Defendants apparently interpret the MOU's reference to board approval to mean that board approval—and specifically approval in the form of a fully executed version of the attachment to the MOU—was a condition precedent to contract formation: "Board approval was a necessary term of the MOU . . . . As such, if the MOU had been

31

approved, there could be no misrepresentation as to the Board's approval of the MOU . . . ." Such an interpretation, however, is in some tension with the language of the MOU. There is no reason for TCGI to "represent[]"anything about what its board had done if the parties' intent was that a fully executed copy of the board resolution must be attached to the MOU for a contract to be formed. Instead, something to the effect of "A copy of the resolution of the TCGI Board approving the MOU is attached here as Exhibit A," perhaps also with a proviso that the MOU only takes effect upon attachment of a copy of a fully executed board resolution, would seem more likely.

When possible, we interpret contracts to give effect to every part and avoid constructions that render terms surplusage. (See Civ. Code, § 1641 [contracts should be interpreted "so as to give effect to every part"]; Code Civ. Proc., § 1858 [in construing an instrument, "where there are several provisions or particulars, such a construction is, if possible, to be adopted *as will give effect to all*" (italics added)]; *Rice v. Downs* (2016) 248 Cal.App.4th 175, 186 ["An interpretation that leaves part of a contract as surplusage is to be avoided"].) Viewed in that light, a more natural reading of the term at issue is that TCGI was representing in the MOU that its Board had adopted a resolution *in the form* of the attached document. Thus, whether the attachment to the MOU was signed by all the TCGI board members is not necessarily dispositive of whether the board ever adopted such a resolution.

We conclude that defendants have not shown the jury's factual findings to be inconsistent or irreconcilable.

**E. Reasonable reliance**

Defendants contend that there is no substantial evidence to establish that eXteres or Winch reasonably relied on the alleged misrepresentation in the MOU that the TCGI Board had approved the MOU. Plaintiffs contend the argument is waived, and in any case without merit. We decline to address the parties' disagreement regarding waiver, finding it more expedient to decide the issue. We find substantial evidence supports a finding of reasonable reliance.

""""Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact."""" (*Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1239.) A trial court sits as the thirteenth juror in ruling on a motion for new trial (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507), but we do not. """"When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact."""" (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 390 (*Orozco*).) When two or more inferences can reasonably be deduced from the evidence, we may not substitute our deductions for those of the finder of fact. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.)

Defendants assert that Winch "knew" that the MOU's representation that the TCGI board had approved it was "untrue," and therefore he and eXteres could not have reasonably relied on that representation. As discussed above, however, knowing whether all TCGI board members had signed the attachment to the May 24, 2018 version of the MOU and knowing whether the TCGI board had approved the MOU are not necessarily the same thing. Defendants also emphasize that, on cross-examination, Winch admitted that the absence of Conrad's and Sangree's signatures could be seen as "a reason" to think the Board had not approved the MOU, as was the email accompanying the May 24, 2018 version of the MOU, stating that Sangree wanted to look through the document as to possible "wording changes." Winch further testified, however, that "that's not how [he] interpreted it."

Winch explained that he took Link's signature on the May 24, 2018 version of the MOU to mean that Link was conveying an offer, not just circulating another draft. He took Link's statement that Sangree might have some changes to mean that both Link and Conrad—a majority of the TCGI board—were "on board" with the current version of the MOU. Based on the state of their negotiations, Winch understood that any changes Sangree might propose would be wording details, rather than substantive changes, and that if Sangree had changes, Link would "recall or rescind the offer." Winch left an ample period for any such retraction before he accepted the offer. Furthermore, although Winch had felt it "prudent" for the TCGI board to approve the MOU, and "[a]t some point" he would want to have a copy of the board resolution, he did not have any

34

"specific knowledge" that a board resolution was required for the MOU to be effective. In this context, the jury found it reasonable for Winch to take at face value the representation in the MOU that it had been approved by the TCGI board, as he testified he had done. The trial court, too, in ruling on defendants' new trial motion, implicitly found Winch's testimony credible and his reliance reasonable. On this record and under the applicable, deferential standard of review, we may not disturb those findings.

## F. Tortious interference with contract

Defendants argue that the evidence could not support a finding in favor of plaintiffs on their tortious interference with contract cause of action. In their view, eXteres's "own conduct" caused the termination of the relevant contracts between eXteres and third parties, and it was "failure to mitigate" that caused eXteres's alleged damages. We find no lack of substantial evidence to support the verdict. (See *Orozco, supra*, 36 Cal.App.5th at p. 390.)

Defendants contend that eXteres "unilaterally" terminated the contracts at issue, so there is no evidence of causation in support of the tortious interference claim. It has long been the rule, however, that a plaintiff "need not allege an actual or inevitable breach of contract in order to state a claim for disruption of contractual relations." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1129.) It is enough that the defendants' actions make "plaintiff's performance . . . more costly or more burdensome." (*Ibid.*) The July 19, 2018 letter from defendants' attorney, although phrased as a "request[]," is reasonably interpreted as a threat of litigation if plaintiffs continued to

have contact with its clients. Those clients, after all, had "existing," albeit indirect, "business relationships with TCGI," given their use of TCGI technology resold by eXteres. We see no reason why such a threat may not be considered actionable interference.

Relatedly, defendants' theory is that eXteres should have mitigated its damages by continuing to work with its existing clients for TCGI's technology. It is not apparent, however, why a finder of fact might be required to find continuing with those contracts despite TCGI's cease-and-desist request/demand to be a reasonable, rather than extraordinary, mitigation effort.[11] (See *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1044 ["Under the avoidable consequences doctrine as recognized in California, a person injured by another's wrongful conduct will not be compensated for damages that the injured person could have avoided by *reasonable* effort or expenditure." (Italics added.)].)

Moreover, defendant's arguments about both causation and mitigation rest on the premise that the July 19, 2018 letter expressed TCGI's willingness to honor the parties' earlier oral contracts. It is questionable whether the letter is best read to express such a sentiment. Arguably, the letter repudiates the parties' prior agreements, while stating a

---

[11] Additionally, as plaintiffs correctly note, the jury instruction on mitigation that defendants cite in briefing, derived from CACI No. 358, applies on its face only to the breach of contract cause of action, and not the tortious interference claim. Defendants did not request an equivalent jury instruction regarding mitigation of damages from tortious interference with contract. Although we exercise our discretion to decide this issue on the merits, we acknowledge plaintiffs' argument that this claim of error was in any case forfeited.

willingness to negotiate a new, more limited "reseller arrangement": "Although it is unfortunate that eXteres and TCGI cannot move forward as originally contemplated by the parties, TCGI is open to discussions in regard to engaging your company through a reseller arrangement . . . ." The statement about the parties' "existing . . . contracts" is phrased in the subjunctive: "Any existing revenue sharing contracts between the two companies *would* be honored by TCGI." That suggests that TCGI's willingness to honor those agreements was conditioned on entering into this new business arrangement. Particularly in the context of the rest of the letter, such language is hardly an unequivocal reassurance that TCGI intended to continue honoring the parties' existing oral agreements.

Defendants have not shown that the verdict on the tortious interference cause of action lacks the support of substantial evidence.

## G. Statute of frauds

Defendants note that Link signed the May 24, 2018 version of the MOU as well as the attached board resolution, but Conrad did not. In their view, one provision of the MOU required Conrad's individual written consent, and not just the assent of the TCGI board, that is, the provision contemplating that Link and Conrad would grant TCGI a "license for the exclusive perpetual use" of their technology once their then-pending

37

patent application was approved. They contend that the lack of Conrad's signature means the entire MOU is invalid under the statute of frauds.[12] Not so.[13]

Under California Civil Code section 1624, subdivision (a)(1), a contract "not to be performed within a year from the making thereof" is "invalid" unless the contract itself "or some note or memorandum thereof" is "in writing and subscribed by the party to be charged or by the party's agent." This law, however, has been interpreted literally and narrowly by California courts. (See *Plumlee v. Poag* (1984) 150 Cal.App.3d 541, 548.) "Only those contracts which expressly preclude performance within one year are unenforceable." (*Ibid.*; see *White Lighting Co. v. Wolfson* (1968) 68 Cal.2d 336, 343 (*White Lighting*) [statute of frauds "applies only to those contracts which, by their terms, cannot possibly be performed within one year"].) "'It has been repeatedly held that, if an

---

[12] The complete text of this provision is as follows: "Jay Conrad and Anthony Link ("Inventors") has [sic] developed a text messaging software platform ("Connections$^{tm}$") and have also filed a patent application for U.S. Non-Provisional Patent titled System and Method for Generating a Tracked Message with serial number US15/684926 Docket 4705 ("Patent"). The Parties along with the Inventors agree to execute a mutually agreeable license for the exclusive perpetual use of the Patent wherein TCGI will be the majority beneficial owner of the rights to the Patent and associate patents, if any, filed or to be filed associated with the Patent. Such agreement shall be executed upon the issuance of the Patent herein referenced."

[13] Plaintiffs are incorrect that defendants failed to raise their statute of frauds defense in the trial court. The defense was pleaded as an affirmative defense in defendant's first amended answer, and the issue was raised in defendants' trial brief. During trial, the statute of frauds was asserted as a basis for nonsuit and for a directed verdict. That preserved the argument for appeal. (*Carrier & Braddock, Inc. v. S.W. Straus & Co.* (1931) 213 Cal.508, 513 [motion for nonsuit not too late]; *Ellis v. Klaff* (1950) 96 Cal.App.2d 471, 475, disapproved on other grounds in *Sterling v. Taylor* (2007) 40 Cal.4th 757, 769 [motion for new trial not too late].)

agreement whose performance would otherwise extend beyond a year may be completely performed within a year on the happening of some contingency, it is not within the statute of frauds.'" (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 674 (*Foley*) [quoting *Carnig v. Carr* (1897) 167 Mass. 544].)

It does not matter how improbable performance of the contract within a year may be. (See *White Lighting*, *supra*, 68 Cal.2d. at p. 343, fn. 2 [generally there "must not be the slightest possibility that it can be fully performed within one year"]; e.g., *Gaskins v. Security-First Nat. Bank of Los Angeles* (1939) 30 Cal.App.2d 409, 418-419 (*Gaskins*) [contract to care for minor children of an incompetent person during their minority "might be fully performed in one year from the date of its execution, as, for instance, would be the case should all the minor children have died within the first year"].) The applicability of the statute of frauds is "analyzed prospectively, based on the intentions of the parties and the terms of the agreement at the time it is made." (*Foley*, *supra*, 47 Cal.3d at p. 674, fn. 18.) The test is whether there is a "'possibility of performance,'" not one of "'probable expectations.'" (*Ibid.*)

In July 2018, when Winch returned the signed MOU, there was a possibility that the license provision at issue could have been performed within a year, even though it contemplated a "perpetual" license. Under the MOU, such a license was to be executed only "upon the issuance of the Patent. . . ." But the then-pending patent application could have been denied at any point, and thus no license for the technology from Link or Conrad in their capacity as inventors—perpetual or otherwise—would be necessary or

39

required. There remained the possibility, therefore, that within a year neither Link nor Conrad would have any obligations remaining to perform under the clause at issue. As such, the statute of frauds does not apply. (See *Gaskins*, *supra*, 30 Cal.App.2d at pp. 418-419.)

Defendants do not contend that Conrad's individual written consent was required for any other provision of the MOU to be valid. We conclude, therefore, that they have not demonstrated that the MOU is invalid under the statute of frauds.

### III. DISPOSITION

The judgment is affirmed. Winch and eXteres are awarded costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

We concur:

SLOUGH
Acting P. J.

MENETREZ
J.